J.A31044/13

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellee | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| GARY LEE GERBER JR., | : | |
| | : | |
| Appellant | : | No. 1415 EDA 2013 |

Appeal from the Judgment of Sentence March 19, 2013
In the Court of Common Pleas of Monroe County
Criminal Division No(s).: CP-45-CR-0000112-2007

BEFORE: BENDER, P.J., LAZARUS, and FITZGERALD,[*] JJ.

MEMORANDUM BY FITZGERALD, J.:  **FILED JANUARY 07, 2015**

Appellant, Gary Lee Gerber, Jr., appeals from the judgment of

sentence for murder in the first degree[1] entered in the Monroe County Court

of Common Pleas. This is the third time this case comes before the Superior

Court.[2] Most recently, another panel of this Court remanded for a hearing

---

[*] Former Justice specially assigned to the Superior Court.

[1] 18 Pa.C.S. § 2502(a).

[2] **See Commonwealth v. Gerber**, 1279 EDA 2011 (order) (Pa. Super. filed Feb. 27, 2012) (remanding for trial court to hold hearing on Appellant's claim of after-discovered DNA evidence); **Commonwealth v. Gerber**, 2028 EDA 2008 (unpublished memorandum) (Pa. Super. filed May 8, 2009) (vacating June 17, 2008 judgment of sentence to permit Appellant to withdraw his guilty plea to third-degree murder).

on Appellant's claim of after-discovered evidence. The trial court held the hearing and denied Appellant's motion for a new trial.[3] Appellant now raises twelve claims divided into the following grounds: (1) the trial court erred in declining to hear his ineffective assistance of counsel claims; (2) Pennsylvania State Police Trooper Frank DeAndrea improperly gave expert testimony at trial; (3) the Commonwealth committed prosecutorial misconduct in cross-examining Appellant about his previously withdrawn guilty plea to third-degree murder in the instant case; (4) the Commonwealth committed prosecutorial misconduct by knowingly presenting seven instances of false or misleading testimony; and (5) he was entitled to a new trial based on newly discovered DNA evidence. We affirm.

The killing of the victim, Robert Hagan, occurred in August of 1993. Appellant, however, was not charged until thirteen years later, in December of 2006. In March of 2008, Appellant pleaded guilty to murder in the third degree and related offenses,[4] and on June 17, 2008, the trial court imposed a sentence of ten to twenty years' imprisonment. On direct appeal, however, this Court agreed with Appellant that the trial court erred in

---

[3] As we discuss *infra*, on remand the trial court also granted Appellant leave to file post-sentence motions *nunc pro tunc*, held a hearing on them, denied them, and resentenced him to life imprisonment.

[4] *See* 18 Pa.C.S. § 2502(c). Appellant also pleaded guilty to possessing an instrument of crime and tampering with physical evidence. *See* 18 Pa.C.S. §§ 907(a), 4910(1).

denying his pre-sentence motion to withdraw guilty plea. We thus vacated

the judgment of sentence and remanded for further proceedings.[5]

The case proceeded to a jury trial in July of 2010.[6] The trial court

summarized the evidence, viewed in the light most favorable to the

Commonwealth, as follows:

> The majority of the facts are not in dispute: in the early morning hours of August 13, 1993, [Appellant] was alone[ ] with the victim in the victim's vehicle while parked along Rimrock Road in Monroe County. At some point while inside the vehicle, [Appellant] "lashed out" on the victim, stabbing him four times in the back[7] . . . . [Appellant] admitted stabbing the victim. [Appellant] also cut the victim's throat in a manner that showed no sign of hesitation; the victim's neck wound was characterized as a superficial wound because no major arteries were cut, but the area had many blood vessels which would have resulted in fairly profuse bleeding. These stab wounds were potentially lethal because [of] the amount of hemorrhaging and blood loss the victim suffered, as well as his collapsed lung.

---

[5] **Gerber**, 2028 EDA 2008. The Pennsylvania Supreme Court denied the Commonwealth's petition for allowance of appeal on February 12, 2010. **Commonwealth v. Gerber**, 674 MAL 2009 (*per curiam* order) (Pa. filed Feb. 12, 2010).

[6] This case was prosecuted by the Office of the Attorney General.

[7] At trial, Appellant testified he was inebriated and parked his pickup truck in a parking lot. N.T., 7/13/10, at 22. Two men approached, told him he could not park there and they would give him a ride, and helped him into what he believed was the victim's car. **Id.** at 23. The next thing Appellant remembered was waking up in the victim's car, his pants and underwear were pulled down, "somebody was on top of" him and "trying to force something into" him, and he felt "excruciating pain." **Id.** at 25, 26. On appeal, Appellant avers the victim was "trying to homosexually rape him." Appellant's Brief at 6.

After being stabbed, the victim exited the car and fled. The victim's body was eventually found on a bridge on Rimrock Road approximately 290 feet away from where [Appellant] stabbed the victim. Blood drops were found in various locations along the road leading toward the bridge on Rimrock Road. [I]t was determined [the victim] had suffered massive injuries to his head, *i.e.* a crushed skull and brain, and massive injuries to his torso, *i.e.*, a crushing injury to his entire side of his chest. These injuries were consistent with him being run over by a car.

[Appellant] stated that, after he stabbed the victim, he got into the driver's seat of the victim's vehicle and drove up Rimrock Road toward Route 611, which is the same direction where the victim's body was found.[FN] Thereafter, [Appellant] drove the vehicle to his father's junkyard and wiped down the interior of the car to clean off the blood. [Appellant] stated that he only cleaned off the steering wheel and the shifter of the vehicle, but also noted that the "car [was] like forensically clean like somebody who knew what they were doing did it." Although [Appellant] only admits having wiped down the interior of the vehicle, [Appellant's] father testified that he also observed [Appellant] wiping down the car from the outside. Additionally, wipe marks were found on the passenger door window of the victim's vehicle and blood was present on the front license plate of the vehicle in a manner that was consistent with someone wiping the license plate. Finally, [Appellant] admitted "getting rid of the car" by dumping it along Schaffer's School House Road.

_____
[FN] [Appellant] testified that he never felt an impact of hitting a body that night, but he did admit that he could have driven through a "brick wall [because he] was so [expletive] scared that night."

_____

In his closing argument, [Appellant's] trial counsel made clear that the majority of these facts were not in dispute. However, the Defense argued that [Appellant] stabbed the victim in self defense, believing that he was being sexually assaulted by the victim. [Appellant] claims

that he began driving the victim's car, but never knew that he hit the victim because of his emotional state after being sexually assaulted and because of the foggy weather conditions that morning. Finally, [Appellant] claims that he dumped the vehicle on Schaffer's Schoolhouse Road because his father told him to and that he never came forward to the police with his self-defense claim because he was ashamed of being sexually assaulted.

Trial Ct. Op., 5/31/11, at 9-10 (citations to trial transcript omitted). We emphasize that at trial, Appellant admitted to hitting the victim with the car but averred he did not know he hit him. *Id.* at 66, 67-68, 68-69.

On July 14, 2010, the jury found Appellant guilty of murder in the first degree. On September 10th, the court imposed a sentence of life imprisonment without parole.

Appellant filed post-sentence motions. He subsequently obtained new counsel, who filed additional post-sentence motions, which included a multiple claims of trial counsel's ineffective assistance.[8] The court held a hearing on February 11, 2011, at which it declined to hear the ineffectiveness claims. Trial Ct. Op., 4/24/13, at 1. The court then denied the post-sentence motions on April 27, 2011.

Appellant took an appeal with this Court.[9] While the appeal was pending, Appellant filed a petition for remand for the trial court to consider

---

[8] Appellant was represented at trial by Demetrius W. Fannick, Esq., and then on post-sentence motions and the instant appeal by William C. Costopoulos, Esq., and David J. Foster, Esq.

[9] *Gerber*, 1279 EDA 2011.

newly-discovered DNA evidence—namely, evidence that his blood was **not** a part of the blood mixture found on the front license plate of the victim's car. This Court granted the petition, vacated the judgment of sentence, and remanded for an evidentiary hearing and determination of whether a new trial was warranted.

At this juncture, we note that pursuant to our remand directive, the trial court's actions were limited to a determination on Appellant's motion based on his claim of newly-discovered DNA evidence. **See** Pa.R.A.P. 2591 ("On remand of the record the court . . . below shall proceed in accordance with the judgment or other order of the appellate court[.]"). Our order specifically provided, "Following the hearing, the trial court **shall either order a new trial or re-impose sentence**." **Gerber**, 1279 EDA 2011 (emphasis added).

Nevertheless, following remand, Appellant filed a motion for discovery, on which the court held a hearing on May 7, 2012. The court denied the motion, and on July 18, 2012, held the hearing on Appellant's newly-discovered DNA evidence claim. On November 14th, it denied Appellant's motion for a new trial and entered an order resentencing Appellant to life imprisonment. At this point, the only relief available to Appellant was to file a direct appeal. **See id.** However, two and a half months later, on February 4, 2013, the trial court granted Appellant leave to file post-sentence motions *nunc pro tunc*. On March 18, 2013, the court then again resentenced

Appellant to life imprisonment without parole, after allowing him an opportunity for allocution. Finally, on April 24th, the trial court entered an order denying Appellant's post-sentence motions and purporting to grant him thirty days to appeal. Appellant filed a notice of appeal within thirty days.

As stated above, Appellant should have filed a notice of appeal within thirty days of the court's denial of his motion based on newly-discovered DNA evidence and re-imposition of sentence. *See* Pa.R.A.P. 903(a) (providing general rule that notice of appeal shall be filed within thirty days after entry of order from which appeal is taken); *Commonwealth v. Crawford*, 17 A.3d 1279, 1281, 1282 (Pa. Super. 2011) (quashing appeal because of untimely notice of appeal). Nevertheless, because the trial court perpetuated the error by specifically granting Appellant leave to file post-sentence motions *nunc pro tunc* and then denying them on the merits,[10] we decline to quash.

Appellant's first claim is that the trial court erred in declining to hear the ineffective assistance of counsel ("IAC") claims raised in his post-sentence motions. He does not allege specific instances of ineffectiveness,

---

[10] The court improperly afforded Appellant a second opportunity to litigate a post-sentence motion. Nevertheless, the issues in the present appeal—excepting his claim pertaining to newly-discovered DNA evidence—were raised in the original post-sentence motions filed after the sentence of September 10, 2010, and thus they are preserved for appeal.

but instead advances a sole claim that under **Commonwealth v. Barnett**, 25 A.3d 371 (Pa. Super. 2011) (*en banc*), *vacated*, 84 A.3d 1060 (Pa. 2014), he "should have been permitted to waive further" review under the Post Conviction Relief Act [11] ("PCRA"), "and the [c]ourt should have entertained the claims of [IAC], especially because the ineffectiveness claims are factually intertwined with the issues raised on direct appeal." [12] Appellant's Brief at 12-13. We hold no relief is due.

In its May 2011 opinion, filed in response to Appellant's last appeal, the trial court noted that **Commonwealth v. Holmes**, 79 A.3d 562 (Pa. 2013), was pending before our Supreme Court. Trial Ct. Op., 5/31/11, at 5 & n.6. The question in **Holmes** was, generally, whether a claim of counsel's ineffective assistance is reviewable on direct appeal. **Commonwealth v. Holmes**, 996 A.2d 479 (Pa. 2010) (order granting allowance of appeal).

---

[11] 42 Pa.C.S. §§ 9541-9546.

[12] Appellant's forty-seven page supplemental post-sentence motion averred trial counsel was ineffective for, *inter alia*, failing to: (1) object to improper expert opinions given by Trooper DeAndrea; (2) object to the Commonwealth's questioning about his prior guilty plea to third-degree murder in this case; and (3) cross-examine or impeach witnesses who gave testimony known to the Commonwealth to be false or misleading.

Appellant raises the above underlying evidentiary claims in this appeal. Attorney Foster argued at the February 2011 hearing for the court to hear the ineffectiveness claims: "[T]he issues are pretty strong, and . . . the time to hear them is now rather than to bifurcate them when they are really related to the same issues at trial." N.T. Post-Sentence Mots., 2/11/11, at 5. As we discuss *infra*, we do hold many of these claims are waived for trial counsel's failure to object contemporaneously.

The trial court opined "the most prudent way to proceed is to follow the general rule espoused in **Grant**," which is that "a petitioner should wait to raise claims of ineffective assistance of trial counsel until collateral review." Trial Ct. Op., 5/31/11, at 5, 7 (quoting **Commonwealth v. Grant**, 813 A.2d 726, 738 (Pa. 2002)). Furthermore, in its April 2013 opinion, the trial court considered Appellant's reliance on **Barnett** and stated "**Barnett** clearly stands for the proposition that a defendant **may** waive PCRA relief in order to litigate ineffectiveness claims on direct appeal." Trial Ct. Op., 4/24/13, at 6-7.

Appellant filed his appellate brief with this Court on July 12, 2013. The sole legal authority he cites in support of this issue is **Barnett**. On October 30, 2013, our Supreme Court issued a decision in **Holmes**:

> [W]e hold that **Grant's** general rule of deferral to PCRA review remains the pertinent law on the appropriate timing for review of claims of ineffective assistance of counsel; we disapprove of expansions of the exception to that rule recognized in **Bomar**;[13] and we limit **Bomar**, a case litigated in the trial court before **Grant** was decided and at a time when new counsel entering a case upon post-verdict motions was required to raise ineffectiveness claims at the first opportunity, to its pre-**Grant** facts. We recognize two exceptions, however, both falling within the discretion of the trial judge. First, we appreciate that there may be extraordinary circumstances where a discrete claim (or claims) of trial counsel ineffectiveness is apparent from the record and meritorious to the extent that immediate consideration best serves the interests of justice; and **we hold that trial courts retain their**

---

[13] **Commonwealth v. Bomar**, 826 A.2d 831 (Pa. 2003).

**discretion to entertain such claims**.

*Holmes*, 79 A.3d at 563 (emphasis added). Furthermore, the Pennsylvania Supreme Court subsequently vacated the Superior Court decision in *Barnett* pursuant to *Holmes*. *Barnett*, 84 A.3d 1060.

Appellant advances no argument why the trial court's reasoning was incorrect. We hold the court's analysis is consistent with *Holmes*. *See Holmes*, 79 A.3d at 563. Accordingly, we do not disturb the court's decision not to hear his IAC claims.

Appellant's second claim on appeal is that Commonwealth witness Trooper Frank DeAndrea improperly gave expert testimony at trial. Appellant avers the following. The trooper "was never qualified as an expert [and] lacked the requisite training and experience to render the opinions he did," his "opinions were never provided to the defense in discovery," and the trial court "never charged the jury . . . that he was an expert witness." Appellant's Brief at 14-15. "The Commonwealth's entire case, and the only evidence adduced to support [its] theory of an intentional killing . . . rested on the testimony of [Trooper] DeAndrea, who was ostensibly called to testify as to the processing of the crime scene." *Id.* at 14. Appellant asserts Trooper DeAndrea gave the following improper expert opinions: "the critical heretofore-undisclosed opinion that [the victim] had been run over twice by [Appellant], forwards and backwards;" the victim's appearance; "the scene of the crime, and the measurements, photographs and evidence gathering

he claimed he undertook;" and interpretation of the evidence, including tire tracks, palm prints, blood, hairs, fibers, the victim's physical injuries, and "automobiles and automobile fluids and other matters that are clearly within the realm of an accident reconstruction" expert. *Id.* at 14, 16. Appellant concludes the trooper's testimony was inadmissible and highly prejudicial and that a new trial is required. We agree with the trial court that these claims are waived.

The trial court opined:

> Failure to raise a contemporaneous objection to the admissibility of evidence at trial constitutes waiver of such claim. *See* Pa.R.E. 103(a)[.] This includes a challenge to the admissibility of alleged "expert testimony" from a police officer.
>
> After review of the trial transcript, we failed to identify where [Appellant's] trial counsel raised an objection on any of these grounds. [Appellant's] present counsel also fails to point to where [Appellant's] trial counsel raised such objection. Accordingly, [Appellant's] claims are deemed waived.[14]

Trial Ct. Op., 5/31/11, at 15 (some citations omitted).

Pennsylvania Rule of Evidence 103(a) provides that a party may claim error in the admission of evidence only if he, on the record, "makes a **timely** objection, motion to strike, or motion in limine," **and** "states the specific ground, unless it was apparent from the context[.]" Pa.R.E. 103(a)(1)(A)-

---

[14] The trial court also set forth, in the alternative, a discussion of the merits of Appellant's claim.

(B) (emphasis added). "We have long held that '[f]ailure to raise a contemporaneous objection to the evidence at trial waives that claim on appeal.'" ***Commonwealth v. Tha***, 64 A.3d 704, 713 (Pa. Super. 2013) (citation omitted). Furthermore, the failure to object at trial "to the admissibility of [an] officer's 'expert' testimony" results in waiver of that issue. ***Commonwealth v. DiPanfilo***, 993 A.2d 1262, 1268 n.8 (Pa. Super. 2010).

Our review of the trial transcript confirms that Appellant did not contemporaneously object to any of the testimony that he now challenges on appeal.[15] Furthermore, the heading in Appellant's appellate brief for this issue concedes there was no objection: "[T]rial counsel was ineffective for failing to object to [Trooper DeAndrea's] expert testimony." Appellant's Brief at 14. Nevertheless, in response to the trial court's suggestion of waiver, he asserts, without citation to legal authority, that "the Commonwealth was under an affirmative obligation pursuant to the

---

[15] Because Appellant raises multiple challenges to Trooper DeAndrea's testimony in this appeal, we further note the following. During the trooper's direct examination, which spanned 106 pages of testimony, Appellant lodged only two exceptions. The first was during the trooper's recitation of his education history; Appellant requested the trooper provide dates for his courses. N.T. Trial, 7/8/10, at 10-11. The second objection was to the trooper's statement, "If you're going to abandon a car and you don't want to hide it, you would just leave it in the middle of the road. If I was going to abandon—." *Id.* at 63-64. Appellant objected to the trooper's "giving his own personal opinion . . . as far as what he would do if he was hiding a car." *Id.* at 64. The trial court sustained the objection.

mandatory disclosure rules of discovery to **submit its expert reports to the defense before trial**." ***Id.*** at 15 (emphasis added).

We hold Appellant has not persuaded this Court to overlook Rule 103's requirement of a contemporaneous objection to evidence. His assertion pertains only to a Commonwealth duty to provide expert reports in discovery; he provides no explanation for why this duty should be construed to also end or correct testimony from its witness at trial. Accordingly, we agree with the trial court that Appellant has waived any evidentiary challenge to Trooper DeAndrea's testimony. **See** Pa.R.E. 103(a)(1); ***Tha***, 64 A.3d at 713; ***DiPanfilo***, 993 A.2d at 1268 n.8.

We likewise find waived Appellant's claim that "the [c]ourt failed to charge the jury that Trooper De[A]ndrea was an expert witness [sic] and how it should consider the expert opinions that he rendered." ***See*** Appellant's Brief at 22. The court instructed the jury without any objection from either party. N.T., 7/13/10, at 268-306. Upon concluding, the court asked the parties, "Gentlemen, anything with respect to the charge?" ***Id.*** at 306. Appellant's counsel replied, "No, Your Honor." ***Id.*** Accordingly, any challenge to the court's jury instructions is waived for failure to object. ***See*** Pa.R.Crim.P. 647(B) ("No portions of the charge nor omissions from the charge may be assigned as error, unless specific objections are made thereto before the jury retires to deliberate."); ***Commonwealth v. Pressley***, 887 A.2d 220, 225 (Pa. 2005) (stating Rule 647 requires specific

objection to jury charge or exception to trial court's ruling on proposed point to preserve issue involving jury instruction).

Appellant's third claim on appeal is that the Commonwealth committed misconduct under Pennsylvania Rule of Evidence 410[16] by cross-examining him about his prior, withdrawn plea to third-degree murder for the instant charges.[17] Because Appellant's argument pertains to how the testimony arose, we quote the pertinent part of the trial transcript. The Commonwealth was cross-examining Appellant about whether he "back[ed] over" the victim with the vehicle. N.T., 7/13/10, at 68-69. Appellant replied, and the Commonwealth continued questioning, as follows:

> [Appellant:] . . . I never knew I hit him so I know I didn't put it in reverse and back over him.
>
> [Commonwealth:] That would be pretty hard to defend, wouldn't it?

---

[16] Rule 410 provides: "In a . . . criminal case, evidence of the following is not admissible against the defendant who made the plea or participated in the plea discussions: . . . (1) a guilty plea that was later withdrawn[.]" Pa.R.E. 410(a)(1).

[17] Appellant also cites **Commonwealth v. Badger**, 357 A.2d 547 (Pa. Super. 1976), for the proposition that a withdrawn guilty plea is inadmissible. Appellant's Brief at 31-32. We disagree that **Badger** is relevant to the issue before us. In that case, the defendant initially "tendered a guilty plea," but during the plea colloquy she pleaded not guilty. **Badger**, 357 A.2d at 548. However, the only two issues on appeal were whether: (1) a notarized statement by her alleged co-conspirator was admissible; and (2) trial counsel was ineffective for requesting the trial judge to recuse. **Id.**

A   Backing over someone?  I wouldn't—**I would have took the deal that you guys offered me**, and I wouldn't even be here if I was an animal like that.  I never knew I hit [the victim.]

Q   What are you talking about?

A   The 10 years.

Q   What 10 years?

A   I would only—I would be released in five years from this date if the Court didn't overturn the case.[18]

Q   Overturn what case, sir?

A   My conviction.

Q   What conviction?

A   When my attorney died before trial.

Q   What conviction are you talking about?

*    *    *

A   Three years ago, before trial was to start, my attorney died.  I was given a choice of going to trial or taking a plea agreement.

*Id.* at 68-69 (emphasis added).

Over the next seven pages of the transcript, the Commonwealth questioned Appellant about the circumstances leading to the entry of his guilty plea and the plea hearing, including Appellant's agreement with the

---

[18] As stated above, Appellant appealed from the ten-to-twenty year judgment of sentence imposed after his guilty plea to third-degree murder.  His sole issue was whether the trial court erred in denying his presentence motion to withdraw his plea.  This Court granted relief on that claim and vacated the judgment of sentence.  *Gerber*, 2028 EDA 2008, at 4-14.

Commonwealth's allegation that he stabbed the victim and hit him with the car. *Id.* at 69-76. Throughout this questioning at trial, Appellant's counsel made no objection. *See id.*

In the instant appeal, Appellant maintains "the prosecutor, who well knew what . . . Appellant was talking about, kept goading [him] into testifying further about the withdrawn plea and then outrageously cross-examined him with the guilty plea colloquy[.]" Appellant's Brief at 30. Appellant concedes that defense counsel did not object,[19] but avers, "This issue was not waived for the Court had an affirmative duty to end, *sua sponte*, this entire fiasco." *Id.* at 30, 31. Appellant then asserts that in the alternative, "this Court should invoke the 'plain error' standard used by the federal courts." *Id.* at 31.

The trial court reasoned this claim is waived because Appellant's counsel failed to object to the testimony. Trial Ct. Op., 5/31/11, at 19-20. The court also provided alternative reasoning that, although his "trial counsel specifically advised [him] to not discuss his withdrawn guilty plea," Appellant did so and thus "open[ed] the door." *Id.* at 21 & n.18. The court further noted, an observation which Appellant ignores, that it "specifically

---

[19] Appellant also avers that trial counsel "compounded this prosecutorial misconduct and error by attempting to rehabilitate [Appellant] on redirect examination by delving additionally into the details of [prior counsel's] death, the refused trial continuance and the guilty plea, all in violation of Pa.R.E. 410(a)(1)." Appellant's Brief at 31.

instructed [the jury] to disregard any evidence with respect to the withdrawn guilty plea." *Id.* at 23 (quoting N.T., 7/13/10, at 288). Finally, the court rejected Appellant's claim that the court should have *sua sponte* ended the questioning, noting he cited no legal authority in support. *Id.* at 20 n.16.

A careful reading of the trial transcript reveals the Commonwealth did not ask Appellant about his prior, withdrawn plea. Instead, it was Appellant who broached this topic while responding to the Commonwealth's question, "That [sic] would be pretty hard to defend, wouldn't it?" N.T., 7/13/10, at 69. As stated above, Appellant's counsel made no objection during the Commonwealth's subsequent examination about the prior plea. On appeal, Appellant again cites no authority in support of his claim that the trial court had a duty to end *sua sponte* the questioning. Our review of Rule 410, its comments, and relevant case authority reveals no such duty. We decline Appellant's request to "invoke the 'plain error' standard." *See* Appellant's Brief at 31. Instead, we find no authority requiring us to set aside Rule 103's requirement of a timely objection to the admission of testimony. *See* Pa.R.E. 103(a)(1). Thus, we find this issue is waived. *See id.*; *Tha*, 64 A.3d at 713.

Appellant's fourth claim is that the Commonwealth knowingly presented multiples instances of false and misleading testimony, all of which were material to the key issues at trial. Appellant's Brief at 37-52. With

respect to some of these claims, we disagree with Appellant's premise—that the cited instances of testimony rose to the level of false and misleading testimony. We find the remaining claims are waived.

Our Supreme Court has stated, "It is . . . an established constitutional principle that a conviction obtained through the knowing use of materially false testimony may not stand; a prosecuting attorney has an affirmative duty to correct the testimony of a witness which he knows to be false." *Commonwealth v. Carpenter*, 372 A.2d 806, 810 (Pa. 1977).

> The prosecution may not knowingly and deliberately misrepresent the evidence in order to gain a conviction. Nevertheless, a claim of purposeful prosecutorial misrepresentation will not stand if examination of the record fails to reveal any indication of deceptive tactics on the part of the prosecution. Minor discrepancies in the Commonwealth's case will not be considered false evidence.

*Commonwealth v. Ali*, 10 A.3d 282, 294 (Pa. 2010) (citations omitted).

In the case *sub judice*, the trial court reasoned that Appellant "had every opportunity to fully-cross-examine all of the Commonwealth's witnesses, enabling him to present to the jury any discrepancies that he found in the Commonwealth's case." Trial Ct. Op., 5/31/11, at 26. The court added that trial was conducted seventeen "years after the crime and the processing of the scene," and that "the lapse in time is one factor . . . when weighing the credibility of the witnesses." *Id.* at 26-27. Finally, the court stated that it gave a jury instruction on false testimony and conflicting evidence, which included this statement:

- 18 -

If you should decide that a witness has deliberately testified falsely about a material point, that is, about a matter that could affect the outcome of this trial, you may for that a reason alone choose to disbelieve the rest of his or her testimony. But you are not required to do so. You should consider not only the deliberate falsehood but also all other factors bearing on the witness' credibility in deciding whether to believe other parts of his or her testimony.

*    *    *

Discrepancies and conflicts between the testimony of different witnesses may or may not cause you to disbelieve some or all of their testimony. . . .

*Id.* at 26 & n.19.

We now review each of Appellant's claims. First, Appellant challenges Trooper DeAndrea's testimony, "**All** of the blood that we found was on the berm side [of the road.] It was not in the travel portion of the road."[20] Appellant's Brief at 40. Appellant cites the Commonwealth's exhibit C-72, as "list[ing] the location of thirteen areas of blood spots," only one of which "was located on the berm."[21] *Id.* at 41. Appellant concludes this exhibit

---

[20] *See* N.T., 7/8/10, at 19 (emphasis added). On appeal, Appellant provides the following context. The location of the victim when Appellant struck him with the vehicle—whether the victim was on the roadway or the berm—was at issue at trial. The Commonwealth's theory of the case was that Appellant "intentionally drove along the berm in order to strike the victim on the berm," whereas Appellant's defense was "that he unintentionally ran over the victim on the roadway itself." Appellant's Brief at 40.

[21] The certified record transmitted to this Court does not include any trial exhibits. We remind Attorney Foster, "Our law is unequivocal that the responsibility rests upon the appellant to ensure that the record certified on appeal is complete in the sense that it contains all of the materials necessary

"directly contradict[ed]" the Commonwealth's opening statement and Trooper DeAndrea's testimony "that all of the blood drops were 'along the berm.'" ***Id.***

On appeal, the Commonwealth concedes "Trooper DeAndrea incorrectly stated on direct examination that 'All of the blood that we found was on the berm side[ and] not in the travel portion of the road." Commonwealth's Brief at 33. However, it argues that because its own exhibit, C-72, "document[ed] the precise locations of the blood drops, thereby providing the jury with the very information that [Appellant] now argues the jury was deprived of," "it can hardly be said that the Commonwealth misled the jury or that its witness committed perjury[.]" ***Id.*** at 33-34. The Commonwealth further argues that "[a]t most [it] provided the jury with conflicting evidence" and the jury was tasked to "resolve evidentiary discrepancies." ***Id.*** at 34.

The trial court noted that Exhibit C-72 "indicates that four blood drops were located east of the fog line, *i.e.* on the berm portion of the roadway and three drops were directly on the fog line." Trial Ct. Op., 5/31/11, at 27. It opined, "As such, any arguable precision in the presentation of the Commonwealth's evidence about the exact location of the blood drops was *de minimus* in nature and of no consequence to the outcome of the trial."

for the reviewing court to perform its duty." ***See Commonwealth v. B.D.G.***, 959 A.2d 362, 372 (Pa. Super. 2008) (citations omitted).

*Id.*

During direct examination, the Commonwealth questioned Trooper DeAndrea about his investigation of a blood trail, which led from the victim's body toward the dirt parking lot, where he was initially stabbed. The following exchange ensued:

[The Commonwealth]: Did you follow the blood trial back?

[Trooper DeAndrea]: Yes.

Q  And what did you discover when you did that?

A   Well, there were several spots along the fog line, the white line of the road, were you could notice some—

Q  If I can interrupt you, on which side of the fog line, the berm side or the roadway side?

A  **All of the blood we found was on the berm side.  It was not in the travel portion of the road.**  And there were, you know, two drops here, three drops there. . . . .

N.T., 7/8/10, at 18-19 (emphasis added).

On cross-examination, Appellant's counsel referred to exhibits that were purportedly photographs of the drops. *Id.* at 135-37.  Counsel asked whether, from viewing the photographs, it was possible to determine if the location of the blood drops were in the roadway or measure the distance between the drops. *Id.* at 136.  The trooper responded that he could not. *Id.*  Counsel then noted the Commonwealth's exhibits purported to show only three blood drops. *Id.* at 137.  The trooper responded, "I testified to exhibits and explained what they were.  Those exhibits are far from every

photo of the side of the road on Rimrock Road." *Id.* He continued, "If you look through all of the photos, I can guarantee you there are more drops of blood." *Id.*

On redirect examination, the Commonwealth introduced Exhibit C-72, which was purported to be "a recording [sic] of the distances of the blood spots." *Id.* at 140. Trooper DeAndrea testified the report showed "20 different measurements," 13 of which were for blood spots. *Id.* at 141.

Appellant's counsel then conducted recross-examination about the exhibit, eliciting Trooper DeAndrea's testimony that there were blood spots 100 feet from the north end of a bridge and 4.5 feet east of the berm line, as well as 104 feet from the north end of the bridge and 2 inches **west** of the line, which would have been in the roadway. *See id.* at 141-44. Appellant's counsel did not point out any inconsistencies between the trooper's testimony and the photographs.

In light of the foregoing, we agree with the trial court's reasoning and the Commonwealth's argument that, notwithstanding the inaccuracy of the isolated statement made by Trooper DeAndrea, the Commonwealth merely presented inconsistent evidence, the weight of which was for the jury to consider against all the evidence presented at trial. Accordingly, we disagree with Appellant that Trooper DeAndrea's testimony rose to the level of false testimony triggering an affirmative duty on the part of the Commonwealth to correct it. *See Carpenter*, 372 A.2d at 810.

Appellant's second claim under his fourth issue alleges multiple instances of false testimony. First, he challenges Trooper DeAndrea's testimony that a photograph depicted "blood soaked earth" in the dirt lot where the incident began.[22] Appellant's Brief at 42. For ease of review, we set forth the following.

At trial, Commonwealth expert witness George J. Surma[23] testified that he prepared a report, entered as Exhibit C-74, of blood testing on various items for comparison to the victim's blood. N.T., 7/12/10, at 7-9. The report showed human blood on several items, including "underwear[,] asphalt[,] nail clippings and a rock." *Id.* at 10. According to Appellant's brief, two additional items were "cans containing the 'soil and blood.'" Appellant's Brief at 42. Surma testified that the genetic markers obtained on the "items were consistent with those of the victim's blood." N.T., 7/12/10, at 11. The following exchange occurred:

> [Commonwealth:] And in some of the many items, you weren't able to identify blood at all, or if you were, you weren't able to go any further than to say that it was, in fact, blood, correct?

[22] *See* N.T., 7/8/10, at 51. Appellant also cites pages 101 through 104 and pages 129 through 132 of the July 8, 2010, trial transcript for additional references to "blood soaked earth." Appellant's Brief at 42. However, our review of those pages does not reveal this phrase. Furthermore, pages 129 through 132 are of defense counsel's cross-examination of Trooper DeAndrea, and thus his testimony was elicited by Appellant himself. Finally, no defense objection to the evidence was made at any of these pages.

[23] Surma was qualified to testify as a forensic expert in serology and microscopy.

[Surma:] **Well, I was able to identify human blood in the items.** But I was only able—like, for instance in . . . a swabbing from the deceased, I was only able to get a PGM 1+ on the blood.

*Id.* (emphasis added).

On appeal, Appellant contends that Exhibit C-74 "did not conclude that the red material soaked into the earth was in fact blood" but instead "determined that the alleged 'blood soaked earth' contained 'nothing of probative value.'" Appellant's Brief at 42. On this premise, he avers the Commonwealth knowingly presented Trooper DeAndrea's false testimony that photographs depicted "blood soaked earth." Appellant isolates Surma's response, emphasized above, to argue Surma "created the **false impression** that he did in fact find human blood in all of the items" listed in the report. Appellant's Brief at 43 (emphasis added).

To Appellant's claim that Surma's testing of "the cans containing 'the soil and blood'" showed "nothing of probative value," the trial court found:

> [A]lthough Commonwealth's Exhibit [C-]74 indicates that the two soil samples taken from the lot contained "nothing of probative value," we note that **the reports do not indicate that the samples were not human blood**. [N]either the Commonwealth nor [Appellant] presented any testimony elaborating on the meaning of this statement.

Trial Ct. Op., 5/31/11, at 27-28 (emphasis added). The court thus reasoned that Appellant's interpretation of the report—that there was no human blood in the samples—is speculative. Appellant's argument on appeal is consistent

with the court's summation; Appellant avers "the lab test results . . . did not conclude that the red material soaked into the earth was in fact blood; rather, those test results . . . determined that the alleged 'blood soaked earth' contained 'nothing of probative value.'" Appellant's Brief at 42. Furthermore, we note Appellant's careful articulation that Surma merely created a "false impression" for the jury, not that Surma testified definitively to a certain fact or expert opinion. *See id.* at 43. Finally, Appellant's prior issue—concerning blood spots on the berm or roadway—concedes there was blood on the ground. Having reviewed Trooper DeAndrea's testimony against the Commonwealth's examination of Surma, we disagree with Appellant's premise that Trooper DeAndrea's testimony was so false or misleading as to warrant a new trial. The weight of the phrase "blood soaked earth" was for the jury to decide.

Appellant next cites additional testimony by Trooper DeAndrea about a photograph, in which he stated: "[A]lthough there are trees that block your view of the lot from the road, **there are no trees in this particular dirt area where the vehicle was parked and all the blood was found**." *Id.* at 44 (emphasis in Appellant's brief). Appellant asserts "the additional testimony of Trooper DeAndrea regarding the location of the car was also false." *Id.* He maintains that in the grand jury investigation, Trooper Thomas Mastruzzo "testified that **the car was near the tree line and would have prevented [Appellant] from getting out of the passenger**

**door because he was pinned up against the wooded area**." *Id.* at 43-44. Appellant concludes that all of these misstatements "falsely contradict[ed]" his own testimony at trial. *Id.* at 45. We find no relief is due.

The trial court noted that "[o]n cross examination, [Appellant] acknowledged that: 1) his exit from the Victim's vehicle was not blocked by anything; 2) he could have opened the door and run away; and 3) he never considered the option of retreating, but instead, immediately 'lashed out' and stabbed [the victim] instead." Trial Ct. Op., 5/31/11, at 28. The court opined "it [was] well within the purview of the jury to determine whether Trooper DeAndrea's and Trooper Mastruzzo's testimony conflict with each other, thereby compelling the jury to determine who and what evidence to believe, or simply, the two witnesses merely had a different interpretation of the evidence found at the scene of the crime." *Id.* at 28-29.

We agree with the trial court that the Commonwealth merely presented evidence that was inconsistent with Appellant's testimony. *See Ali*, 10 A.3d at 294. Appellant's argument—on this as well as his other false testimony claims—would require the Commonwealth to present uniform evidence and any variance or discrepancy amounts to the knowing presentation of false evidence.

Appellant next avers the Commonwealth knowingly presented the false testimony by Trooper DeAndrea that "slide marks on . . . [the victim's] face

correspond with the **same slide marks on the road**, the same direction as if when the body is being run over is pushed toward Route 611 and his head included." Appellant's Brief at 45-46 (citing N.T., 7/8/10, at 45). Appellant also complains that Trooper DeAndrea testified, in reference to a photograph, Exhibit C-9, "This corresponds with that because this is all skin and fat that's left sliding on the road. If you've got a really bad brush burn, that's they type of slide mark that is that [sic] correlates or corresponds with that." *Id.* at 46 (quoting N.T., 7/8/10, at 45). Appellant maintains that Trooper DeAndrea was not the accident reconstructionist in this case. Instead, Appellant avers, the accident reconstructionist was State Police Corporal Gerald Gallagher, and he testified at the grand jury "there were no scrape or slide marks on the roadway caused by the victim sliding on the roadway by the impact." *Id.*

The trial court opined:

> At trial, the Commonwealth introduced Commonwealth's Exhibit #7 which depicted the Victim's body as it was found on the roadway and specifically showed the existence of scrape marks. These marks were composed of skin and fat left on the roadway as the Victim's body was pushed toward the curb. This photographic evidence corroborates Trooper DeAndrea's testimony. To the extent that Trooper Gallagher may have said something that conflicted with this evidence, said conflict is of no effect. The physical evidence presented in this case tends to support Trooper DeAndrea's version of events and as such, there is no intentional falsity as claimed by [Appellant].

Trial Ct. Op., 5/31/11, at 29 (citing N.T., 7/8/10, at 3; Ex. C-7).

As stated above, the certified record does not include the trial exhibits and thus this Court cannot review Exhibit C-7 or C-9. Appellant's brief does not dispute, let alone mention, the trial court's discussion of C-7 above. Appellant bore the burden of ensuring the certified record includes all of the materials necessary for our review. **See B.D.G.**, 959 A.2d at 372. Because our analysis of Appellant's issue requires review of these exhibits, we hold this particular claim is waived. **See id.**

Appellant's next claim of false evidence is Commonwealth witness Elaine Foulides' testimony that "she had never seen the 'Joe Camel jacket' that was found in [the victim's] vehicle the night of the incident." Appellant's Brief at 46 (citing N.T., 7/12/10, at 103). Appellant alleges the following. The Commonwealth "clearly elicited this information to create the false impression that the Joe Camel jacket belonged to" Appellant and argued in closing argument: "there was contamination on the one thing which just happened to be the only thing that didn't belong to the" victim. Appellant's Brief at 47. However, the Commonwealth "knew full well that the Camel Joe jacket" belonged to the victim, as Trooper Gallagher had testified before the grand jury that the jacket belonged to the victim. **Id.** We find this claim waived for failure to object at trial.

Our review of the trial transcript reveals the following. The witness Foulides testified she met the victim in 1981, the victim was her best friend, and she identified his body after the incident. N.T., 7/12/10, at 99, 101.

The Commonwealth asked Foulides to describe her relationship with the victim, and Appellant objected. The following exchange occurred at sidebar:

> THE COURT [Addressing Appellant's counsel]: What's your objection[?]
>
> [Appellant's counsel]: Relevance.
>
> THE COURT: Do you want a proffer?
>
> [Commonwealth]: Two things, life in being [sic] and peacefulness. That's part of the motions *in limine* which I filed. And once there's a self-defense injected into a case, the Commonwealth has a right to elicit testimony regarding peacefulness.
>
> And beyond that [Foulides] identified the remains. She can say that was his car, and **she can say he never had a Joe Camel jacket which is relevant to show that . . . it was something foreign used in the car. That's the one item that had that contamination on it, so I think it's highly probative.**
>
> [Appellant's counsel]: **Okay.**

*Id.* at 100 (emphasis added). The sidebar discussion concluded and the Commonwealth resumed questioning, which included three questions about the Camel Joe jacket: whether she had seen "the photographs of the . . . jacket that was found draped over the seat of the [victim's] car," if she had "ever seen [the jacket] before," and if the jacket belonged to the victim. *Id.* at 101, 103. Appellant raised no contemporaneous objection to these questions or Foulides' responses.

We hold this claim is waived because Appellant's counsel had agreed to the Commonwealth's proffer of Foulides' testifying about the Camel Joe

jacket. *See* Pa.R.E. 103(a)(1); *Tha*, 64 A.3d at 713. We reiterate that in the proffer, the Commonwealth specifically stated the jacket was "the one item that had that [sic] contamination on it." N.T., 7/12/10, at 100. Furthermore, Appellant raised no objection to the questions posed by the Commonwealth about it or to Foulides' responses. *See id.* at 103.

Appellant next argues the Commonwealth made misleading statements at the February 2011 evidentiary hearing on his post-sentence motions, specifically during recross-examination of Appellant's trial counsel, Attorney Fannick. We quote Appellant's lengthy claim:

> At the February 2011 evidentiary hearing, the prosecutor conducted the following recross examination of Attorney Fannick . . . in an effort to counter the defense assertion (regarding the testimony at trial of Trooper De[A]ndrea, addressed below) that there was no evidence, factual, expert, or otherwise, provided to the defense before trial to support the Commonwealth's claim (presented at trial for the first time through the "expert" testimony of Trooper De[A]ndrea) that [Appellant] "backed up" his vehicle over the victim—the **only** evidence that supported the first-degree murder claim of an intentional killing.
>
> The prosecutor falsely and misleadingly referred to non-existent statements of a truck driver as related to a woman who supposedly reported to the police that the trucker heard a vehicle hit what sounded like a deer, the vehicle stopped and **then it sounded like it backed up again over the deer**. . . .

Appellant's Brief at 48 (citing N.T., 2/11/11, at 45-47). Appellant reasons as follows. "[N]o such statements exist[ed]." Appellant's Brief at 48. Instead, the woman referred to by the prosecutor was Patricia Ann Labar, who worked at the Comfort Inn near the scene of the homicide. She told the

police she "punched in" at 4:00 a.m. that morning, "had just driven by the scene and did not see anything out the ordinary," and that her daughter Brenda, who also worked there, told her "that a truck driver told [sic] that around [4:30] that he heard a car hit something and squeal its tires taking off [sic.]" *Id.* at 48-49. "The woman reported **nothing** about the trucker saying **that he heard a vehicle stop and proceed in reverse** after hitting what sounded like a deer." *Id.* at 49.

The trial court opined:

> Upon review of [Appellant's] argument and Defense Counsel's questioning of Attorney Fannick at the hearing on [Appellant's] Post-Sentence Motions[ ], we can only surmise that [Appellant] is trying to once again attack the lay opinion testimony of Trooper DeAndrea rendered at the time of trial. Perhaps he is claiming a violation of the prosecution's duty to provide discovery on this issue, although as written, it is difficult to understand. We rely on our earlier arguments with regard to the classification and credibility of Trooper DeAndrea's testimony.

Trial Ct. Op., 5/31/11, at 32-33.

We agree with the trial court's reasoning. Although this claim appears under Appellant's argument that "[t]he Commonwealth knowingly presented false and/or misleading **testimony** to the **jury**," Appellant's Brief at 37, 48 (emphases added), his primary challenge is to the prosecutor's question posed to a witness at the post-sentence hearing.

More importantly, Appellant would have this Court overlook Attorney Fannick's response that he did **not** agree with the Commonwealth's statements. The Commonwealth's statement, which Appellant now

challenges, arose during recross-examination of Attorney Fannick. N.T., 2/11/11, at 45. We emphasize Attorney Fannick's responses:

> [Commonwealth: One interview was] of a trucker who was staying at the hotel that was—his room was several hundred yards from the location of the [victim's] body, and [the trucker] indicated to the Pennsylvania State Police that he had heard the striking of the vehicle and that it sounded like that it had hit a deer. He heard that the vehicle stopped and **that it sounded as if it backed up over the deer**. Isn't there such an interview in the discovery that you have?

> [Attorney Fannick: T]hat was the statement that I was referring to. Quite honestly, whether or not—I mean, I recall now that person indicating that they did hear a vehicle, that they did hear the vehicle hit something, and that they heard the vehicle stop. That's what I recall right now. I do know there was a report. I do know that I reviewed it.

> Q And **you're saying that you don't have a specific recollection of the interview also saying that it sounded as if the vehicle backed up over the object again?**

> A **As I sit here now, no.** I would have to review the report again.

> Q We'll find it for you. Do you also recall that there was a second interview of an employee of the hotel who worked in the lobby who was interviewed and she repeated what [sic] the trucker came down and told her which was consistent with what I just told you?

> A I do know there was a report from a woman who worked there who identified the statement of the other—or verified whatever report you want to use, the statement of the trucker. Again, specifically **as I sit here now, I would have to look at the report again**.

> Q But would it be fair for me to say that if it's in the report you read it?

> A    Yeah. **I just don't remember the report**.

[Commonwealth:]  That's all I have on the issue.

*Id.* at 45-47 (emphases added).

In the instant appeal, Appellant wholly ignores Attorney Fannick's repeated statements that he did not remember the contents of the report referred to by the Commonwealth.   Again, this examination was not conducted at trial, and neither the Commonwealth's questions nor Attorney Fannick's responses were trial evidence for a jury.   Accordingly, we decline to find statements made in the Commonwealth's questioning at a post-sentence hearing amounted to false **testimony** requiring a new trial.

Appellant's sixth and final claim under this issue is that Trooper DeAndrea gave false opinion testimony that he "'backed up' over the victim." Appellant's Brief at 51.   Appellant maintains this testimony conflicted with the expert opinion of the Commonwealth's forensic pathologist, Dr. Isidore Mihalakis, that the victim's "lower extremities," from "the waist down[,] was not wheel run over [sic]."[24]  **See** N.T., 7/8/10, at 176.   However, Appellant avers Trooper DeAndrea "'opin[ed]' that the [victim's] pants were torn when the [victim's] vehicle ran him over backwards on the buttocks."  Appellant's

---

[24] Appellant's brief states: "When discussing the string from the [victim's] pants, Trooper De[A]ndrea testified as follows.  **See** [Reproduced Record at] 24 a.," and "Dr. Mihalakis opined as follows.  **See** [*id.* at] 47a."  Appellant's Brief at 51.  However, he sets forth no testimony.  Nevertheless, we glean the relevant testimony from his argument and the citations to his reproduced record.

Brief at 51.

The trial court opined that this claim was waived for failure to raise this claim in Appellant's post-sentence motion, although it was raised in the brief accompanying the post-sentence motion. Trial Ct. Op., 5/31/11, at 30. Appellant does not address this analysis. We disagree that the issue is waived for failure to raise it in the post-sentence motion. Nevertheless, we hold the issue is waived for failure to raise a contemporaneous objection to Trooper DeAndrea's testimony. *See* Pa.R.E. 103(a)(1); *Tha*, 64 A.3d at 713.

Trooper DeAndrea testified about a photograph entered as Exhibit C-62 in part as follows:

> So it appeared that the only way for the thread from the [victim's] torn pants to get on the car there and have the patterning injury matching the pattern of the steel under the car is for this portion of the car to have come in contact with his left rear buttocks tearing the pants at the same time.

N.T., 7/8/10, at 87. Subsequently, Dr. Mihalakis testified on cross-examination that "there was no crushing injuries to the [victim's] legs." *Id.* at 174. When asked if there were no crushing injuries to the victim's hips, the expert responded, "Only the one of the **right** side there with the avulsion tear of the iliac crest." *Id.* at 175 (emphasis added). Dr. Mihalakis also agreed there were no "crushing injuries in the **left** buttocks, the hips, [and] the legs." *Id.* (emphasis added). He then agreed "the lower

extremities of the [victim's] body from . . . the waist down was not wheel run over." *Id.* at 176.

We deem the above testimony to be merely conflicting testimony from two Commonwealth witnesses. In light of Dr. Mihalakis' testimony concerning injuries to the victim's right hip and the lack of crushing injuries in his left buttocks, we disagree that Trooper DeAndrea's testimony rose to the level of was false evidence knowingly presented by the Commonwealth. While Trooper DeAndrea's testimony was not entirely identical to Dr. Mihalaki's opinion, the weight of the testimony was for the jury to decide. Because Appellant raised no objection to Trooper DeAndrea's testimony, this issue is waived on appeal.

We now reach Appellant's final claim on appeal—that he is entitled to a new trial because of newly discovered DNA evidence: the blood on the vehicle's front license plate was not his. We summarize his argument as follows. At trial, the Commonwealth informed the jury there was a mixture of blood from the victim as well as "an unknown individual, with the strong implication" that it was Appellant. Appellant's Brief at 52. The Commonwealth "forcefully argued in closing . . . that the evidence of wiping down the license plate . . . proved that . . . Appellant acted intentionally and

not accidentally."[25] *Id.* at 54. "In his own testimony, [Appellant] denied wiping down the front license plate[.]" *Id.* at 53.

Appellant further claims that at the time of trial, the Commonwealth had his DNA but "**intentionally fail[ed]**" to test and compare it to the DNA profile of the blood on the license plate. *Id.* at 55, 57. Appellant claims he "recently obtained evidence demonstrating that the blood on the license plate, which the jury was told was a mixture of [the victim's] and another individual's, in fact was not his." *Id.* at 54. This new evidence—that the victim "and some other, unknown individual" contributed the DNA on the license plate—"is substantively different from what the Commonwealth had so vigorously maintained and argued . . . at trial: that it came from [the victim] and another individual, meaning, of course, . . . Appellant." *Id.* at 57. Finally, Appellant alleges: (1) "this DNA evidence could not have been obtained prior to the conclusion of the trial by the exercise of due diligence" because he "was not able to confirm until recently that this DNA blood sample was in fact submitted to [the state police] in 2008;"[26] (2) the DNA

---

[25] Appellant cites the testimony of Commonwealth witness Michael Albertson, that Appellant told him about the incident and stated he, Appellant, had "wiped [the car] all down." N.T., 7/9/10, at 67.

[26] Presumably in support, Appellant states: (1) at the original sentencing in June of 2008, following his guilty plea to third-degree murder, the trial court ordered the Department of Corrections to obtain his DNA blood sample and fingerprints; and (2) his "pro se numerous requests" for information were "repeatedly refused" until he "was finally able to obtain documentation that his DNA blood sample was in fact taken at SCI Coal Township on December

evidence is exculpatory because it "definitively excluded [him] as a contributor of any DNA evidence on the blood license plate;" (3) "the evidence will not be solely to impeach the credibility of a witness;" and (4) the evidence "would likely result in a different verdict if a new trial were granted" because if the jury had heard "his blood **was not** part of the mixture of blood evidence found on the front license plate . . . it would never had accepted the Commonwealth's evidence and argument that he acted intentionally and maliciously in killing the victim and then attempting to cover up the crime by wiping down the plate." *Id.* at 58-59.

"When we examine the decision of a trial court to grant a new trial on the basis of after-discovered evidence, we ask only if the court committed an abuse of discretion or an error of law which controlled the outcome of the case." *Commonwealth v. Padillas*, 997 A.2d 356, 361 (Pa. Super. 2010) (citation omitted).

> To be granted a new trial based on the basis of after-discovered evidence:
>
> [Defendant] must demonstrate that the evidence: (1) could not have been obtained prior to the conclusion of the trial by the exercise of reasonable diligence; (2) is not merely corroborative or cumulative; (3) will not be used solely to impeach the credibility of a witness; and (4) would likely result in a different verdict if a new trial were granted.

---

16, 2008 and submitted to the . . . State Police DNA Database Laboratory." *See* Appellant's Brief at 55-56.

> The test is conjunctive; the defendant must show by a preponderance of the evidence that each of these factors has been met in order for a new trial to be warranted.
>
> [T]he petitioner must explain why he could not have produced the evidence in question at or before trial by the exercise of reasonable diligence. [D]ue diligence requires that defendant act 'reasonably and in good faith to obtain the evidence, in light of the totality of the circumstances and facts known to [him]'[.] Thus, a defendant has a duty to bring forth any relevant evidence in his behalf. . . . Likewise, a defendant who fails to question or investigate an obvious, available source of information, cannot later claim evidence from that source constitutes newly discovered evidence. Absent a plausible explanation for the failure to discover the evidence earlier, evidence obtained after trial should not be deemed "after-discovered"; to allow the defendant to claim information actually or constructively within his knowledge and available to him is after-discovered.

*Id.* at 363-64 (citations omitted).

We reiterate that trial was conducted in July 2010. Appellant's brief does not specify how or when he acquired the "new" DNA evidence. Instead, he avers he "recently obtained [the] evidence,"[27] and that Dr. Terry Melton "compared [his] DNA profile based on samples obtained by Ruth Ann Harner[28] using a DNA kit with the DNA profiles generated by the State Police's own expert, Mr. Mayberry." Appellant's Brief at 54, 56.

---

[27] Appellant also asserts he "was not able to confirm until recently that his DNA blood sample was in fact submitted to [the state police] in 2008." Appellant's Brief at 58. However, the submission of his DNA blood sample to the state police is not newly discovered evidence warranting a new trial.

[28] The trial court explained that Ruth Ann Harner is Appellant's ex-wife. Trial Ct. Op., 5/31/11, at 6.

Again, Appellant wholly ignores the discussion set forth in the trial

court's opinion, which reveals the following pertinent facts and findings:

> [Appellant] was given the [state police] report describing he two DNA profiles obtained from the mixed DNA sample in October of 2007. He was, as of that date, put on notice that: (1) the evidence removed from the license plate contained a DNA mixture; (2) the victim . . . could not be excluded as one of the contributors; (3) one of the contributors was unidentified; and (4) this information might be introduced by the Commonwealth at trial. **If [Appellant] and his counsel had wanted to, they could easily have obtained a sample of his own DNA . . . and had it analyzed by an independent laboratory and compared to the DNA test results described in the [state police] report prior to his trial in July of 2010.** His own DNA profile was always available to him . . . **and he simply waited until October of 2011 to do anything in this regard.**

Trial Ct. Op., 11/4/12, at 5 (quoting and agreeing with Commonwealth's

Brief, 10/22/12, at 10-11). The court further reasoned that Appellant "failed

to provide a plausible explanation for his failure to discover his own DNA

profile and have it compared to the DNA mixture found on the license plate."

Trial Ct. Op., 11/4/12, at 7.

> The testimony of the witnesses at the evidentiary hearing clearly establishes that it is relatively easy to obtain one's own DNA sample and have it analyzed by a laboratory in a relatively short period of time, even if you are confined to a state correctional institution. [Appellant's] ex-wife, . . . Harner, testified that she was able to obtain a DNA kit from Mitotyping Technologies sometime around July 4th or 5th 2012 and deliver the kit to Cheryl Rivera, a certified nursing assistant and [Appellant's] niece. Cheryl Rivera testified that she went to the prison facility . . . on July 9, 2012, and utilizing the DNA kit[,] took a swab from inside of [Appellant's] cheek, put the swab into the packaging provided with the kit,

> sealed the envelopes and took the package to the post office immediately and mailed it back to Mitotyping Technologies. Dr. Terry Melton of Mitotyping Technologies testified that she received the DNA swab kit . . . on July 9, 2012, and that the sample . . . was used to generate an STR profile of [Appellant's] DNA. The report that was generated by Dr. Melton was ready and presented to defense counsel and the Court on July 18, 2012. Clearly, this was not a long and drawn out.

Trial Ct. Op., 11/4/12, at 6.

As stated above, Appellant's argument on appeal fails to address this analysis by the trial court. He merely asserts, without further explanation, that "the DNA profile could not have been obtained prior to the conclusion of the trial by the exercise of due diligence." Appellant's Brief at 58. We find no merit to Appellant's bald claim. Instead, we agree with the trial court that Appellant failed to establish the first prong of a newly discovered evidence claim. *See Padillas*, 997 A.2d at 363-64. Consequently, we hold a new trial is not required.

As one final claim in this appeal, Appellant argues in the alternative that

> the Commonwealth committed prosecutorial misconduct by having possession of [his] DNA blood sample some two years before trial but failed/refused to have it tested and compared to the blood sample taken from the vehicle or, in fact, had it tested and compared but knowingly and intentionally withheld that information from the defense and the jury at trial.

Appellant's Brief at 59. We find no relief is due.

At trial, Pennsylvania State Police DNA forensic scientist supervisor

Kenneth Mayberry testified that he could "determine . . . definitively" whether the "mixture DNA" on the front license plate came from more than one person or if it came from the victim. N.T., 7/12/10, at 71, 72. He also testified that there could have been DNA from a second individual in the mixture DNA. *Id.* at 74.

On appeal, Appellant concedes that at trial, the Commonwealth argued and presented evidence that DNA on the front license plate came from the victim and **an unknown individual**. *Id.* at 52, 55, 57. His argument, however, is that the Commonwealth strongly intimated that he, Appellant, was the unknown individual, and that his new DNA evidence conclusively excludes him as that unknown individual. As stated above, he asserts this conclusion—that the new DNA evidence established the victim "and some other, unknown individual" were the contributors of the DNA on the license plate—was "substantively different" from the Commonwealth's argument that the DNA "came from [the victim] and another individual." *See id.* at 57.

Finding Appellant's issues either waived or meritless, we have no basis for disturbing the judgment of sentence.

Judgment of sentence affirmed.

J. A31044/13

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 1/7/2015