372 A.2d 806

**COMMONWEALTH of Pennsylvania**

v.

**James H. CARPENTER, Appellant.**

Supreme Court of Pennsylvania.

Argued Jan. 10, 1977.

Decided April 28, 1977.

Michael J. Stack, Jr., Philadelphia, for appellant.

F. Emmett Fitzpatrick, Dist. Atty., Steven H. Goldblatt, Asst. Dist. Atty., Chief, Appeals Div., James A. Shellenberger, Philadelphia, for appellee.

Before EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

## OPINION OF THE COURT

EAGEN, Chief Justice.

Appellant, James Carpenter, was convicted by a jury of murder of the third degree. Post-verdict motions were denied and a sentence of not less than seven and one-half nor more than fifteen years imprisonment was imposed. This direct appeal followed.

Carpenter asserts several trial errors which he urges require reversal of the judgment and the grant of a new

trial. We do not agree and for the reasons stated herein, we affirm the judgment of sentence.

The charges arose from the stabbing death of one Beatrice Wheeler in her residence at 1312 Fitzwater Street, Apartment 11–D, in Philadelphia on June 8, 1974. A brief review of the principal evidence will be helpful in understanding the specific errors asserted by Carpenter.

The Commonwealth initially put on Officer Lester Williams, a security guard for the Philadelphia Housing Authority, who was on duty at the Fitzwater Street housing project on the evening of June 8, 1974. Williams testified that at approximately 10:30 p. m. he saw Carpenter and the victim's four-year-old grandson entering the apartment building at 1312 Fitzwater Street. At approximately 11:05 p. m. Williams received a call at the Housing Authority headquarters about a disturbance at apartment 11–D, 1312 Fitzwater Street. He proceeded to that apartment, where he found the victim's body lying on the kitchen floor in a pool of blood. A large butcher knife was found on the floor next to the body.[1] Williams further testified various members of the victim's family, including her husband [Julius Wheeler], were present at the apartment when he arrived. Williams also related that he had known Carpenter for approximately seven months at that time, that Carpenter and the victim had been living together, and that he [Williams] had been called to apartment 11–D on numerous occasions to quell domestic disturbances between

---

1. The victim was pronounced dead at the scene and the cause of death was later established as stab wounds of the chest and back. The medical examiner placed the time of death between 9:15 p. m. and 11:45 p. m. but opined that death probably occurred closer to the earlier time.

A photograph of the knife recovered at the scene was introduced into evidence and the medical examiner testified the victim's wounds were consistent with the type of wound which could be inflicted with such a weapon. It was also established that the stains on the knife were human blood, type B, which matched samples obtained from the blood on the floor of the apartment.

Carpenter and the victim. According to Williams, on at least two of those occasions the victim exhibited physical injuries.[2]

Mrs. Margaret Lewis, the victim's sister-in-law, testified that on June 8, 1974, at approximately 10:00 p. m. she received a telephone call from Carpenter in which he told her he killed Beatrice Wheeler.[3] Mrs. Lewis related that she then called her brother, Julius Wheeler, the victim's estranged husband, and informed him of Carpenter's call.

Julius Wheeler testified he received his sister's call and, as a result, he went to Beatrice Wheeler's apartment at 1312 Fitzwater Street. When he arrived there he discovered the victim's body lying on the kitchen floor in a condition similar to the description given by Williams. This discovery was followed shortly by the arrival of security guards from the Philadelphia Housing Authority, and later, by the arrival of Philadelphia police officers and detectives. Wheeler further testified that some time later he answered the telephone, which was ringing, whereupon he recognized the caller's voice to be that of Carpenter. He immediately advised Detective George Hedgeman of the caller's identity and handed him the telephone receiver. Hedgeman related that when he took the receiver and placed it to his ear, the caller asked "Is Bea dead?" According to his testimony, Hedgeman replied she was in the hospital and requested the caller to identify himself, whereupon the caller stated, "She better be dead from what I put on her," and hung up.

2. Williams testified: "One time her mouth was cut and another time it was her eye, I believe it was her right eye was swollen."

3. Mrs. Lewis recalled the substance of the conversation as follows:
"He said, 'This is Jimmy, can I get in touch with your brother?' So I said, 'Why?' He said, 'Because I've just killed Bea.' I said, 'Oh, you are kidding.' He said, 'No, I am not kidding,' and he hung up."

The Commonwealth also introduced the testimony of Thomas Edwards, who related he became acquainted with Carpenter at a Pocono Mountain resort hotel where both men were employed. Edwards testified Carpenter told him in June of 1974 he stabbed a woman named Bea because he suspected her of infidelity.[4] Carpenter was arrested on June 23, 1974.

Carpenter's only witness was Samuel Tayoun, the custodian of the Philadelphia prison records, who testified Carpenter was in continuous confinement between December 8, 1973 and May 10, 1974.

Carpenter's first claim of error concerns the admissibility of Detective Hedgeman's testimony as to the substance of the second telephone conversation noted above. Hedgeman testified over the objection of defense counsel and on cross-examination conceded he was not familiar with the caller's voice. Carpenter contends the identification of the caller was therefore inadequate as a matter of law, and Hedgeman should have been precluded from relating the substance of the conversation.

 It is beyond cavil that before one of two parties to a telephone conversation may testify as to the substance of the conversation, the identity of the other party must be established. *Commonwealth v. Sullivan*, 436 Pa. 450, 263 A.2d 734 (1970); *Burton v. Pacific Mutual Life Insurance Co.*, 368 Pa. 613, 84 A.2d 310 (1951); *Smithers v. Light*, 305 Pa. 141, 157 A. 489 (1931). While this

4. Edwards recalled the substance of Carpenter's statement as follows:

"Q. Now, tell us, as best you recall, in your own words, step by step, what the conversation was about?
"A. It was about murder. All I know is he said and he called this girl's name Bea.
\* \* \* \* \* \* \* \* \* \*
"Q. What did he say about Bea?
"A. He said that he had stabbed her. He said with a knife and he had seen the blood come out of her nose and her mouth.
"Q. Did he ever tell you why he had stabbed her?
"A. He said he thought she was messing around."

is generally done by testimony as to the witness' recognition of the other party's voice, this is not the only permissible method of establishing the other party's identity. Indeed, proving the identity of a party to a telephone conversation is no different than proving any other fact and may be accomplished by direct or circumstantial evidence. *Commonwealth v. DeRohn,* 444 Pa. 334, 282 A.2d 256 (1971); *Commonwealth v. Gold,* 123 Pa.Super. 128, 186 A. 208 (1936). See *Commonwealth v. Rose,* 449 Pa. 608, 297 A.2d 122 (1972); *Reach v. National Bedding Co.,* 276 Pa. 467, 120 A. 471 (1923); *Limestone Products and Supply Co. v. Tom Brown, Inc.,* 198 Pa.Super. 375, 181 A.2d 696 (1962); *Midland Credit Co. v. White,* 178 Pa.Super. 607, 115 A.2d 788 (1955); *Kobierowski v. Commonwealth Mutual Insurance Co.,* 175 Pa.Super. 387, 105 A.2d 179 (1954).

Instantly, Julius Wheeler testified that he knew Carpenter for about two or three years, that he had spoken to him many times in person and on the telephone, and, with respect to this particular telephone call, that he positively identified the caller's voice to be Carpenter's. The record also indicates that Wheeler handed Hedgeman the receiver immediately upon recognizing Carpenter's voice and that Hedgeman did not have to wait for the caller to speak. Finally, it is significant that Hedgeman's testimony was preceded by the testimony of Edwards and Mrs. Lewis, the substance of which was that Carpenter made similar incriminating statements on two other occasions. Under these circumstances, we are of the opinion the inference that it was Carpenter who spoke to Hedgeman was entirely reasonable. The possibility someone replaced Carpenter at the other end of the line during the transfer of the receiver from Wheeler to Hedgeman is remote at best, and certainly not sufficient to make the conclusion that Carpenter was the speaker a matter of conjecture or speculation. As such, it was not error for the trial court to per-

mit Hedgeman to testify as to the substance of the telephone conversation.[5]

■■ Carpenter similarly contends Margaret Lewis' testimony concerning the telephone call she received from Carpenter was erroneously admitted into evidence because of insufficient identification. This contention is also without merit. At trial Mrs. Lewis testified she knew Carpenter and had conversed with him approximately five or six times in person, as well as three or four times on the telephone. Further, she testified she was able to recognize his voice. This evidence was clearly sufficient to support a finding by the jury that it was Carpenter who telephoned Mrs. Lewis, and as such, established the foundation requisite to permit testimony as to the substance of the conversation. *Commonwealth v. Del Giorno*, 303 Pa. 509, 154 A. 786 (1931). Carpenter argues Mrs. Lewis' credibility was patently defective because of alleged inconsistencies between her trial testimony and earlier statements.[6] These inconsistencies, if any, did not bear on the question of admissibility, but rather were properly a matter for the jury to consider in determining the weight to be afforded Mrs. Lewis' testimony. Cf. *Commonwealth v. Farquharson*, 467 Pa. 50, 354 A.2d 545 (1976).

Carpenter's remaining claims of error must likewise be rejected. Carpenter asserts Officer Williams' testi-

---

5. Carpenter also contends that Hedgeman's testimony concerning this telephone call was erroneously admitted because this evidence was obtained in violation of the Pennsylvania Anti-Wiretapping Statute, 18 Pa.C.S.A. § 5701 et seq. (Supp.1976–77). Carpenter failed, however, to raise this issue at trial and therefore, it has not been properly preserved for appellate review. *Commonwealth v. Stoltzfus*, 462 Pa. 43, 337 A.2d 873 (1975); *Commonwealth v. Clair*, 458 Pa. 418, 326 A.2d 272 (1974).

6. At trial Mrs. Lewis testified she had met Carpenter approximately five or six times. On cross-examination defense counsel pointed out she had testified at the preliminary hearing to approximately four personal conversations with Carpenter and on a separate occasion had told a police detective she had seen Carpenter approximately three times.

mony was false and, he argues, he was therefore denied due process by the Commonwealth's failure to correct such testimony when it appeared. He further asserts the Commonwealth's use of this allegedly false testimony compelled him to offer rebuttal evidence which disclosed his prior criminal record and thereby unfairly prejudiced him before the jury.

As noted earlier, Williams was the Commonwealth's first witness and testified, inter alia, that he had been called to apartment 11-D, 1312 Fitzwater Street, on numerous occasions to quell domestic disturbances between Carpenter and the victim. During direct examination he recalled he had been to that apartment "about nine times" during the approximately seven months he had known Carpenter. He further related he had removed Carpenter from the premises "maybe four or five times." During cross-examination he stated that "maybe around seven" of the disturbances had taken place between December 1973 and May 1974. Defense counsel also elicited from Williams the testimony that these disturbances, as well as the events of June 8, 1974, were noted either in the patrol logs or incident reports, which he had not brought to the courtroom. Apparently, an understanding was reached that Williams would return the following day with these records.[7]

At the beginning of the next day's session, defense counsel moved for a mistrial on the ground that Williams' testimony was "patently untrue." Defense counsel informed the court that a check of prison records disclosed Carpenter had been incarcerated continuously from De-

---

7. During redirect examination Williams indicated he had made an effort to get the logbooks before coming to court, but was unable to do so because he received notice to appear only the previous afternoon at 5:30 p.m. He also indicated a willingness to return with the records but added a caveat: "I will try to. I don't know the length of time that they keep them down there."

cember 8, 1973, until May 1974.[8] Defense counsel argued in support of the motion for mistrial that the Commonwealth's use of this allegedly false testimony compelled Carpenter to testify himself or to present evidence to show he was in prison. After hearing argument from both sides, the trial court apparently denied the motion and directed the parties to proceed. The court, however, suggested the following:

"THE COURT: I think for you to do is to proceed. [sic] I think this is an issue of a fact that has been created, of course, is a question as to whether or not these facts are crucial or not as far as the guilt or innocence of the defendant is concerned. My only feeling is that I would like to have the Commonwealth check the prison records and if the Commonwealth is convinced that this witness was in error or uncertain of his testimony, I would like to see a stipulation to that fact without the necessity of making any reference to prison. I do think that it is unfortunate that we have to get into any question of defendant's prior confinement. So let us proceed and during the next available recess, I wish you to check the prison records, Mr. Boland."

Williams was then recalled and testified from the logbook and the incident report as to the events of June 8, 1974. Upon questioning by the court, Williams related that the logbook which he brought to court covered only the period from June 4, 1974, to December, 1974. The logbook covering prior dates had not been retained by the Housing Authority. (The trial was conducted March 17–20, 1975). Additionally, Williams again testified as to the other occasions on which he had gone to apartment 11–D. He produced incident reports from October 29, 1973, November 5, 1973, and May 17, 1974, detailing disturbances at apartment 11–D involving Carpenter on

8. The exact date of the termination of Carpenter's confinement was not placed on the record until Mr. Tayoun testified for the defense.

those dates. Williams further testified he recalled other incidents involving Carpenter for which no incident report existed; he explained it was normal procedure not to prepare an incident report when the complaining party decided not to press the complaint.

Williams was again intensively cross-examined and reaffirmed his earlier statement that there had been approximately seven incidents between December and May. During redirect examination, however, he conceded he was mistaken about the exact dates.

It is, of course, an established constitutional principle that a conviction obtained through the knowing use of materially false testimony may not stand; a prosecuting attorney has an affirmative duty to correct the testimony of a witness which he knows to be false. *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed. 2d 104 (1972); *Napue v. Illinois*, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959); *Commonwealth v. Gaddy*, 468 Pa. 303, 362 A.2d 217 (1976); *Commonwealth v. Moehring*, 445 Pa. 400, 285 A.2d 487 (1971). We are of the view, however, the evidence complained of instantly was not false. Williams testified initially from memory alone and the record indicates his answers to questions concerning the dates and number of occasions, prior to June 8, 1974, on which he had gone to apartment 11–D were repeatedly qualified as being less than certain recollections.[9] After careful study of the record we are

9. For example, during his initial appearance as a witness, Williams gave the following testimony in pertinent part:
BY MR. BOLAND [Assistant District Attorney]
"Q. Now I ask you prior to the night in question, that is, prior to June 8, 1974, had you had occasion to go to the apartment 11–D on any other occasions?
"A. Yes.
"Q. On how many occasions, if you remember?
"A. About nine times."
\* \* \* \* \* \* \* \* \* \*
"Q. Officer, did you have occasions on other times when you were summoned to the apartment to eject this defendant from the apartment?
"A. Yes.

convinced that, except for the three dates substantiated by the incident reports, Williams did not clearly remem-

"Q. On how many occasions?
"A. I'm not sure, but maybe four or five times."
❖　＊　＊　＊　＊　＊　＊　＊　＊　＊
BY MR. STACK [Defense Counsel]
"Q. How many other occasions? [referring to how many times Williams had seen the victim's grandson in the apartment]
"A. I am not sure.
"Q. Is it more than the nine that you testified to?
"A. Well, when I said nine. I said approximately nine times, I don't have my records to prove how many times or whether it was more or lower than that I had went there."
❖　＊　＊　＊　＊　＊　＊　＊　＊　＊
"Q. Now, what was the first disturbance in that period of December of 1973 to June 8, 1974?
"A. I don't remember the first disturbance in detail, but the disturbances were that when we came in contact with Mr. Carpenter, they were all domestic.
"Q. In 11–D?
"A. Yes.
"Q. Was there anyone in December?
"A. Yes."
❖　＊　＊　＊　＊　＊　＊　＊　＊　＊
"Q. What was the next disturbance?
"A. I don't remember.
"Q. Was there any in January?
"A. It could have been.
"Q. But you don't remember?
"A. No.
"Q. February?
"A. I don't remember."
❖　＊　＊　＊　＊　＊　＊　＊　＊　＊
"Q. Now, how many of these disturbances involving Mr. Carpenter took place between December and, let's say, the beginning of May?"
＊　❖　＊　＊　＊　＊　＊　＊　＊　＊
"A. I'm not sure, maybe around seven."
During his second appearance Williams gave the following testimony in pertinent part:
BY MR. BOLAND
"Q. Now, yesterday you testified that you recall some of these incidents occurred in December of 1973.
"A. Yes, sir.
"Q. Are you positive that they occurred in December?
"A. I am not sure.
"Q. Could they have occurred earlier or later than that?
"A. Yes."
❖　＊　＊　＊　＊　＊　＊　＊　＊　＊
"Q. When you were testifying yesterday, you were testifying directly from your memory?
"A. Yes, that is correct."

ber exactly when he went to apartment 11–D and his testimony was at worst mistaken in this respect.[10] Compare *Commonwealth v. Gaddy, supra.* In addition, Williams produced incident reports substantiating disturbances involving Carpenter for three dates which are not inconsistent with the dates of his incarceration. Williams also offered an explanation which, if accepted by the jury, was adequate to cover the other incidents he recalled, but for which no records were produced. With regard to this latter point, it is also worth noting that Carpenter was in custody only part of the months of December 1973 and May 1974, particularly since Williams testified that the frequency of the disturbances was erratic, "sometimes maybe once or twice a week, or two times a day." Williams' testimony can therefore be reconciled with the dates of Carpenter's confinement. Since Williams' testimony was not false, we are not persuaded the Commonwealth breached its duty by failing to correct false testimony. Cf. *Commonwealth v. Sweeney,* 464 Pa. 425, 347 A.2d 286 (1975); *Commonwealth v. Jennings,* 446 Pa. 294, 285 A.2d 143 (1971).[11]

10. Indeed, defense counsel conceded at trial the assistant district attorney had not knowingly offered perjured testimony.

11. Furthermore, after Williams clarified his testimony on recall, Carpenter failed to renew his motion for a mistrail or to raise any further objection manifesting a continuing dissatisfaction with the evidence. Notwithstanding the trial court's expressed willingness to entertain a stipulation, Carpenter failed to request a stipulation to the effect he could not have been involved in any disturbance at apartment 11–D between December 8, 1973 and May 10, 1974. The record is barren of any effort by Carpenter to seek corrective action after Williams testified on recall. Thus, assuming arguendo Williams' testimony could be characterized as containing an element of falsity, it is questionable whether Carpenter did not waive his objection to any impropriety by his inaction. See *United States v. Harris,* 498 F.2d 1164 (3rd Cir. 1974), cert. denied, 419 U.S. 1069, 95 S.Ct. 655, 42 L.Ed.2d 665 (1974). It is, of course, the prosecutor's duty to take corrective measures when false testimony appears. *Giglio v. United States, supra; Napue v. Illinois, supra; Commonwealth v. Gaddy, supra; Commonwealth v. Moehring, supra.* But where, as here, defense counsel is aware of a potential defect in the evidence and an

In view of the foregoing conclusion, we are also not persuaded Carpenter was compelled to disclose his prison record. Carpenter made no attempt to avoid disclosing his prior imprisonment or to mitigate the potential prejudice thereof after his motion for a mistrial was denied. Notwithstanding the trial court's expressed willingness to entertain a stipulation, Carpenter failed to request a stipulation to the effect he could not have been involved in any disturbance at apartment 11–D between December 8, 1973 and May 10, 1974. Nor did he at any time request cautionary instructions as to the limited purpose for which the evidence of his imprisonment could legitimately be considered. In an effort to totally discredit Williams' testimony before the jury, Carpenter made a tactical choice to reveal his incarceration, obviously with the idea that it would have a more dramatic effect on the jury in their evaluation of Williams' credibility. Having opted for what he considered to be the most effective means of making his point, Carpenter cannot now complain he was prejudiced thereby. See *Commonwealth v. Gaddy, supra.* Cf. *Commonwealth v. DeMarco,* 225 Pa. Super. 130, 310 A.2d 341 (1973).

Accordingly, the judgment of sentence is affirmed.

JONES, former C. J., did not participate in the consideration or decision of this case.

ROBERTS, J., concurs in the result.

effort is made to ameliorate the defect, it would appear there are substantial reasons for requiring the defendant to register an objection as to the adequacy of that effort. Cf. *Commonwealth v. Clair,* 458 Pa. 418, 326 A.2d 272 (1974).