J-A20020-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| ANTONIO LEWIS, | |
| Appellant | No. 2758 EDA 2014 |

Appeal from the Judgment of Sentence April 28, 2014
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0001893-2012

BEFORE: DONOHUE, SHOGAN, and WECHT, JJ.

MEMORANDUM BY SHOGAN, J.:                **FILED SEPTEMBER 14, 2015**

Appellant, Antonio Lewis, appeals from the judgment of sentence entered April 28, 2014, following his conviction by a jury on November 1, 2013, of attempted murder, aggravated assault, robbery, recklessly endangering another person ("REAP"), and a firearms violation. We affirm.

The trial court summarized the facts of the crime as follows:

> On the night of August 12 and into the early morning hours of August 13, 2011, Andy Love and his wife Danielle went with some friends to visit another friend, "Sonny." They went to 3149 Levick Street in Northeast Philadelphia. Andy had also brought along his friends Jovon ("Joon") and Keenan Commarty, and some of his wife's girlfriends. They sat with Sonny reminiscing and drinking, when someone suggested smoking marijuana. Around this time, Mr. Love saw three men enter the house and begin speaking with Sonny; he believed they were supplying the marijuana. One of these men walked up to Mr. Love and said: "You look like somebody I know," but Mr. Love insisted he did not know the man. He then pulled out a gun and told Mr. Love to hand over all of his money. Mr. Love did not

take this seriously at first and laughed. The man said: "It's not a joke," and shot Mr. Love in the leg. Mr. Love attempted to grab the gun from the man and punched him in the face. Then he turned to run from the house. While he was running away he was shot again. Mr. Love testified that his arms felt like they had been paralyzed following the shots from behind.

At around 1:30 A.M., Officer Michael Smith responded to a report of a shooting in the area of 3149 Levick Street. Officer Smith was travelling southbound on Frankford Avenue when he observed the complainant, Mr. Love, laying in the middle of the road. Mr. Love was in and out of consciousness, moaning in pain, and bleeding heavily when Officer Smith approached. Officer Smith radioed for an ambulance and secured the scene. Two men approached the officer and said they were present at the time of the shooting. The first witness, who was visibly upset at the time, told the officer that the complainant had been robbed and shot. He also gave the officer a description of the man responsible for the shooting.

Mr. Love's wife, Danielle, was not present at the time of the shooting. She had left the house briefly with a friend, and, upon returning, found police blocking off the area. Before leaving the party, Mrs. Love recalled seeing the Appellant in attendance.

The complainant's sister-in-law, Gina Fehr, visited him in the hospital, but was unable to speak to him when she first arrived. Her sister, the complainant's wife, told her what had happened later. Ms. Fehr knew Sonny from the neighborhood and was Facebook friends with him, so she went to his Facebook page. She saw pictures of Sonny with some of his friends, including several of him with the Appellant. She brought her laptop to the hospital to show the pictures to Mr. Love and asked if he recognized anyone. Mr. Love became teary-eyed upon seeing the picture, and immediately identified the Appellant as the man who had shot him. Mrs. Love also recognized the Appellant as having been at the party before she left. Ms. Fehr and Mrs. Love then showed the pictures to the police, and Ms. Fehr gave a statement about her search.

Detectives Andrew Danks and Christopher Casee were assigned to investigate the shooting. In the course of their investigation, the detectives wanted to speak to Sonny about the

incident, and had Mr. Love give Detective Casee's phone number to Sonny through Facebook. Sonny called the number, believing he was speaking to Mr. Love. Sonny apologized for the incident and told Detective Casee: "It wasn't supposed to go down like that." Detective Casee, continuing to pose as Mr. Love, asked Sonny to speak with the police and to contact Detective Danks if he knew anything about the shooting. Within a half an hour, Sonny called back, and after apologizing again, put another man on the phone to speak to Detective Casee. The man identified himself as "Tone," which is also the nickname associate[d] with Appellant on Facebook. Tone insisted the incident "wasn't supposed to go down like that" and said Sonny had nothing to do with the shooting. Detective Casee once again asked them to speak to Detective Danks, but Sonny never called the detectives.

While Appellant was in prison awaiting trial, he made several phone calls to friends and family that were recorded. Within 48 hours of his arrest Appellant made calls repeatedly asking others: "You got to stay on him. Yo, stay on Andy. Stay on him, get him." He also asked them to "get him to come off that."

In the weeks following the shooting, Mrs. Love was contacted by Appellant's girlfriend, Michelle, about the incident and her husband's statement. Although she had never met the woman before, Michelle came to the Love's residence five or six times. Mrs. Love was also approached by Appellant's mother, who wanted Mr. Love to speak to Appellant's attorney. The Appellant's girlfriend also picked up Mr. and Mrs. Love and drove them to the preliminary hearing.

At trial, Mr. Love testified that he has limited use of his right arm and continues to feel pain; he has also lost feeling in several fingers in his right hand. The injuries have also affected his everyday activities, and his relationship with his children.

Trial Court Opinion, 12/11/14, at 3–5 (internal citations to notes of testimony omitted).

Appellant was arrested in September of 2011. On November 1, 2013, a jury convicted him of the above-described charges. The court sentenced

Appellant on April 28, 2014, to consecutive terms of imprisonment of nine and one-half to thirty years for attempted murder, nine to eighteen years for robbery, and five to ten years for the firearm violation, for an aggregate term of twenty-three and one-half to fifty-eight years of imprisonment. The remaining charges merged for sentencing purposes. Appellant filed a post-sentence motion on May 1, 2014, that was denied by operation of law on September 3, 2014. Appellant filed this timely appeal on September 12, 2014. Both Appellant and the trial court complied with Pa.R.A.P. 1925.

Appellant raises the following issues for our review:

1. Did the lower court abuse its discretion in allowing the Commonwealth to present evidence of a post on [Appellant's] Facebook page made months before the crime, where the evidence served only to infer to the jury that [Appellant] had violent tendencies?

2. Did the lower court err in allowing a detective to testify to a phone conversation he supposedly had with[Appellant], where there was no authentication of the voice as [Appellant's]?

3. Did the prosecutor commit misconduct in her closing argument where she told the jury that the victim identified someone else as his assailant at the preliminary hearing because he was afraid that he and his family were going to be killed if he identified [Appellant], where there was no evidence of any such threats?

4. Did the prosecutor commit misconduct in her closing argument where she asked the jury to infer [Appellant's] guilt based on his failure to assert his innocence after he was arrested?

5. Was the verdict against the weight of the evidence?

6. Did the lower court abuse its discretion by considering the actions of Appellant's family in determining the sentence and

- 4 -

by sentencing [Appellant] at the upper end of the aggravated range of the guidelines without putting its reasons for doing so on the record?

Appellant's Brief at 4–6.

The first two issues involve the admission of evidence and are governed by the following standards:

> We review all matters touching upon the admission of evidence, including the trial court's gatekeeping function regarding what evidence a jury gets to observe and handle during a trial, for an abuse of discretion. *See Commonwealth v. Brown*, 617 Pa. 107, 52 A.3d 1139, 1197 (2012) (citation omitted); *Commonwealth v. Dupre*, 866 A.2d 1089, 1102 (Pa. Super. 2005). "An abuse of discretion is not merely an error of judgment, but is rather the overriding or misapplication of the law, or the exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will or partiality, as shown by the evidence of record." *Commonwealth v. Mendez*, 74 A.3d 256, 260 (Pa. Super. 2013) (citation omitted), *appeal denied*, ___ Pa.___, 87 A.3d 319 (2014). "[I]f in reaching a conclusion the trial court over-rides or misapplies the law, discretion is then abused and it is the duty of the appellate court to correct the error." *Commonwealth v. Weakley*, 972 A.2d 1182, 1188 (Pa. Super. 2009) (citation omitted).

*Commonwealth v. Ali*, 112 A.3d 1210, 1217–1218 (Pa. Super. 2015).

"[A]n erroneous ruling by a trial court on an evidentiary issue does not necessitate relief where the error was harmless beyond a reasonable doubt." *Commonwealth v. Travaglia*, 28 A.3d 868, 874 (Pa. 2011).

Appellant first argues that the trial court abused its discretion in allowing the Commonwealth to present evidence of a post on Appellant's

"Facebook" page.[1]  The victim's sister-in-law, Gina Fehr, testified that her sister, Danielle, the victim's wife, told her that the person who shot the victim was friends with a man named "Sonny."  N.T., 10/29/13, at 64.  Ms. Fehr stated that she was Facebook friends with Sonny, a man she knew "from the neighborhood."  *Id*.  Ms. Fehr took her laptop computer to the hospital and showed the victim pictures posted on Sonny's Facebook page.  *Id*. at 64–65.  Upon seeing Appellant's photograph,[2] the victim "pointed out the guy that did it, and . . . hysterically started crying.  He was, like, 'Yup.  That is him.  That is him.'"  *Id*. at 65, 70.[3]

Either later that day or the next day, Ms. Fehr told police about the victim's identification of the Facebook photographs.  *Id*. at 72.  Ms. Fehr ultimately gave police a statement regarding the photographs.  *Id*. at 73, 82.

---

[1]  "Users of that Web site may post items on their Facebook page that are accessible to other users, including Facebook 'friends' who are notified when new content is posted."  *Elonis v. United States*, ___ U.S. ___, ___, 135 S.Ct. 2001, 2004 (2015).

[2]  Ms. Fehr testified that upon scrolling the computer mouse over Appellant's photograph, Sonny had "tagged" Appellant, and his name appeared as "Top Dog."  N.T., 10/29/13, at 68, 78.  *See Elonis*, 135 S.Ct. at 2005 (tagging is a Facebook feature that alerts the person in the photograph to the posting).

[3]  Ms. Fehr testified that she did not suggest to the victim that Appellant was his shooter, did not imply to the victim that other people advanced that contention, nor did she, in any way, point out Appellant's photograph other than to show the victim the posted pictures on Sonny's Facebook page.  N.T., 10/29/13, at 70–71.

Ms. Fehr further testified that when she "clicked" on Appellant's name, listed as "Tony Top Dog Lewis," his entire Facebook profile was public, lacking privacy settings that could have been designated. N.T., 10/29/13, at 66, 68–69, 78. Appellant's Facebook page also included a post from May 20, 2013, nearly three months before the instant crime, that stated:

> "If it ain't a rumor it's true, but I don't like conversation. I don't involve nothing. I'd rather get it off my chest and revolve something."

*Id*. at 75. Defense counsel objected to admission of the post, stating, "[W]e have no idea what this item that is posted on the Facebook page may have anything to do with and it's just speculation." *Id*. at 74. Following a sidebar that was not transcribed, the trial court overruled the objection. *Id*.

Appellant maintains there was no foundation for admitting the posted quote and asserts that this cryptic statement "made months before the crime . . . could [not] be interpreted as referring to a revolver as evidence that Appellant had access to a gun that could have been used in the crime." Appellant's Brief at 14. He avers that it did not establish that Appellant had a revolver or any other weapon. *Id*.

The trial court concluded that the Facebook post "support[ed] the reasonable inference that Appellant was in possession of a revolver. It also support[ed] an inference that Appellant may be more likely to use a revolver in a confrontation." Trial Court Opinion, 12/11/14, at 7. We disagree.

While we agree with the Commonwealth that because Appellant was charged with attempted murder, his mental state was highly relevant, we disagree that Appellant's use of the phrase "'revolve something' has no sensible purpose other than to suggest [Appellant's intended] resort to a revolver, the weapon he used to shoot the victim," and that it is evidence of his state of mind. Appellant's Brief at 9. Appellant's word choice could equally be interpreted as a typographical error or misuse of the word "revolve" and reflect, instead, an intended use of the word "resolve," which makes as much sense as the nonsensical use of "revolve" in the quote.

Nevertheless, Appellant is not entitled to relief on this claim because admission of the post was harmless error. Our Supreme Court has described that doctrine as follows:

> [T]he doctrine of harmless error is a technique of appellate review designed to advance judicial economy by obviating the necessity for a retrial where the appellate court is convinced that a trial error was harmless beyond a reasonable doubt. Its purpose is premised on the well-settled proposition that "a defendant is entitled to a fair trial but not a perfect one."
>
> [**Commonwealth v. Thornton**,] 494 Pa. 260, 266, 431 A.2d 248, 251 (1981). This Court may affirm a judgment based on harmless error even if such an argument is not raised by the parties.

**Commonwealth v. Allshouse**, 36 A.3d 163, 182 (Pa. 2012) (footnote omitted), *cert. denied sub nom.*, **Allshouse v. Pennsylvania**, ___ U.S. ___, 133 S.Ct. 2336 (2013). Harmless error exists where:

- 8 -

(1) the error did not prejudice the defendant or the prejudice was *de minimis*; (2) the erroneously admitted evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted evidence; **or** (3) the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict.

*Commonwealth v. Stokes*, 78 A.3d 644, 654 (Pa. Super. 2013) (emphasis added), *appeal denied*, 89 A.3d 661 (Pa. 2014).

Our conclusion of harmless error, as explained by the trial court, is as follows:

[I]t seems likely that all three factors are present here. Certainly, evidence of the shooting and robbery were introduced through other witnesses. The evidence of the Facebook post was merely bolstering other evidence, including eyewitness testimony and Appellant's own statements, and can be considered cumulative. Because there was so much other evidence implicating Appellant, any prejudice created in admitting the contents of the Facebook post would have been *de minimis* at most. Even still, the strongest factor here is the third. Andy Love, the victim of the shooting, was able to identify the Appellant as the individual who demanded money from him, then shot him once in the leg. He also testified that he was shot again by the Appellant as he tried to run away, and witness testimony constitute[d] overwhelming and uncontradicted evidence of guilt.

Trial Court Opinion, 12/11/14, at 8–9. We conclude Appellant is not entitled to relief on this claim of error.

Appellant next asserts the trial court abused its discretion in admitting testimony from Detective Christopher Casee concerning a statement from Appellant made to the detective on the telephone. As background, when Ms. Fehr showed the Facebook photographs to her sister Danielle, Danielle

identified a photograph of Appellant by the name, "Tone." N.T., 10/29/13, at 87. Additionally, the victim identified Appellant as a man he had met through Sonny and who he knew as "Tone" on the street. *Id*. at 109. During Detective Casee's visit to the victim in the hospital, the victim told the detective that he was trying to get in touch with Sonny because the victim was with Sonny on the night of the shooting. N.T., 10/30/13, at 137. Detective Casee gave the victim his cellular telephone number and told him to tell Sonny to contact the detective about the shooting. *Id*. at 138.

When Sonny called the detective's number, Sonny spoke as if he were speaking to the victim. Detective Casee testified that Sonny stated, "I am sorry, you know, for what happened. I wasn't involved. It wasn't supposed to do down like that." N.T., 10/30/13, at 139. Detective Casee testified that he played along as if he were the victim, telling Sonny, "he should cooperate with the police, that I was his boy, that he did me wrong, and if he knew any information on the shooting he should contact Detective [Andrew] Danks." *Id*. at 140. Eventually, a man Detective Casee believed to be Appellant spoke on the telephone, likewise appearing to believe he was talking to the victim and identifying himself as "Tone," who stated "the shooting wasn't meant to be . . . and apologizing for what happened." *Id*. at 140–141. There were a number of other telephone conversations and one voice mail message to which Detective Casee had the victim listen. The victim identified the voice as Sonny. *Id*. at 147–148. Detective Casee

ultimately gave a statement to Detective Danks concerning these conversations. *Id*. at 141, 145.

Detective Casee's testimony concerning the statement he gave to Detective Danks is as follows:

> [By Detective Casee]:  At first when I received the phone call the male on the other end said, "Yo, Bro.  It's me, Sonny."  I replied, "What's up, man?"  And the male on the other side believing who I was, I told him that he should contact the detectives and tell them what had happened, and I stated, told him that—that I, being [the victim], told the detectives that Sonny had nothing to do with it and if he was truly on my side, my friend for him to contact the detectives.  At which time he told me he would think about it and give me a call back.  I told him to hurry up and give the detectives a call 'cause I needed him to cooperate.  It says this conversation lasted for four minutes and 23 seconds.
>
>                \*  \*  \*
>
> [By the Commonwealth]:   Did you receive another phone call within a half an hour?
>
>                \*  \*  \*
>
> A.  Yes . . . .
>
> Q.  The person on that phone call, was it the same voice . . .?
>
> A.  Yes, it was.
>
>                \*  \*  \*
>
> Q. Okay.  What did he say?
>
> A.  Um, when I answered the phone this time he said, Hey.  He said, Bro, and asked how I was feeling.  I was still talking like I was [the victim].  I told him that I wasn't feeling too well and that I was pissed off that he wouldn't help the police find the male that shot me.  I told him that I was shot three times. . . [H]e told me, hold on, hold on.  Someone wants to holler at you.

That is when another male voice got on the phone and started talking to me.

Q. And did that male voice identify himself?

A. He said to me, "Yo, Man. This is Tone. Sonny's man." At which time I replied back to him, "Which boy are you?" He again said, "Sonny's man." I then asked, "What, the boy that shot me?" And the same male said, "Look, Man. The shit wasn't supposed to go down like that. We was throwed that night and on some real shit." I said to him again like I was [the victim], "You fucken shot me, Man, and you and Sonny are fucked up and that's some real shit." And then he again told me that, "The shit wasn't supposed to do go down like that and Sonny was my man and he didn't have anything to do with it." I said exactly to him, "I have no more wrap for your ass and put Sonny back on the phone." At which time the other male voice who I believe to be Sonny was saying Sonny had nothing to do with it. I again told him . . . to make sure he calls Detective Danks.

* * *

Q. . . . [D]id Sonny call Detective Danks?

A. He never called Detective Danks, no.

N.T., 10/30/13, at 143–146.

Appellant asserts that the trial court admitted this evidence without proper authentication. He maintains that Detective Casee did not know Appellant's voice to recognize it on the telephone, and the evidence was not properly authenticated pursuant to Pa.R.E. 901.[4]

---

[4] **Rule 901. Authenticating or Identifying Evidence**

**(a) In General.** To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is.
*(Footnote Continued Next Page)*

The trial court stated the following, in pertinent part:

Circumstantial evidence allowed the detective to determine that the individual he spoke to on the phone was the Appellant. This is sufficient to authenticate the conversation . . . .

In the instant case . . . detectives had contextual clues and testimony from one of the parties on the phone call. Appellant identified himself at the start of the conversation as "Tone," which is also how he was identified in several Facebook photos. N.T., 10/29/2013, at 156. Although the phone call was not recorded, Detective Casee testified to the conversation he had with Appellant, when he was pretending to be [the victim]. N.T., 10/30/2013, at 145.

* * *

The fact that Appellant identified himself in the conversation, and the fact that he vaguely attempts to apologize to the complainant for shooting him, are strong pieces of circumstantial evidence that allowed the detectives to authenticate the phone call as having come from the Appellant. Unlike [*Commonwealth v.*] *Koch*, [39 A.3d 1005 (Pa. Super. 2011),] which lacked any such corroborative evidence, here the detectives had Appellant's own admissions and direct testimony

*(Footnote Continued)* ─────────────

**(b) Examples.** The following are examples only--*not a complete list*--of evidence that satisfies the requirement:

* * *

(5) Opinion About a Voice. An opinion identifying a person's voice--whether heard firsthand or through mechanical or electronic transmission or recording--based on hearing the voice at any time under circumstances that connect it with the alleged speaker.

(emphasis added). The comment to Rule 901 provides that "Pennsylvania law has permitted the identification of a voice to be made by a person familiar with the alleged speaker's voice. ***See Commonwealth v. Carpenter***, 472 Pa. 510, 372 A.2d 806 (1977)." Pa.R.E. 901, cmt.

- 13 -

> from Detective Casee to aid them in authenticating the phone call. Therefore, this claim must also fail.

Trial Court Opinion, 12/11/14, at 11–12.

Initially, we note that Pa.R.E. 901(b) makes it clear that the examples provided in the rule for authentication are not exhaustive. Moreover, the victim was familiar with Sonny's voice. Through a voice message left at the telephone number the victim had given Sonny, the victim was able to identify Sonny's voice, and testimony established that the voice identified by the victim as Sonny was the same voice on subsequent telephone calls with Detective Casee. N.T., 10/30/13, at 148. When the second male came on the telephone, he identified himself as "Tone," which is the name Danielle identified as describing Appellant in Facebook photographs and the street name the victim used to describe Appellant. N.T., 10/29/13, at 87,109.

We conclude the evidence was properly authenticated and consistent with Pennsylvania law. *See Commonwealth v. Carpenter*, 372 A.2d 806 (Pa. 1977) (accused's identity as telephone caller was sufficiently established to permit detective to testify regarding such telephone conversation where, although detective was not familiar with caller's voice, witness who answered telephone and handed receiver to detective, was familiar with accused's voice and positively identified caller's voice as that of accused). "It is clear . . . that when seeking to introduce testimony as to the content of a telephone conversation, the identity of the caller may be established by circumstantial evidence." *Commonwealth v. Stewart*, 450 A.2d 732, 733

(Pa. Super. 1982). Furthermore, in **Carpenter**, the defendant's attacks on the credibility of the identification testimony "did not bear on the question of admissibility, but rather were properly a matter for the jury to consider in determining the weight [of the evidence]." **Carpenter**, 372 A.2d at 809.

The trial court did not abuse its discretion in admitting this evidence. The victim was familiar with Sonny's voice and recognized it. In addition, the second voice identified himself by his street name, Tone, and the context of the conversation provided details indicating that he was familiar with the circumstances of the crime. He offered an explanation for the shooting as a plan that went awry. Therefore, Appellant's challenge to the admissibility of testimonial evidence of the telephone call lacks merit.

Appellant's next two issues involve allegations of prosecutorial misconduct during closing arguments. "Prosecutorial misconduct does not take place unless the 'unavoidable effect of the comments at issue was to prejudice the jurors by forming in their minds a fixed bias and hostility toward the defendant, thus impeding their ability to weigh the evidence objectively and render a true verdict.'" **Commonwealth v. Holley**, 945 A.2d 241, 250 (Pa. Super. 2008) (quoting **Commonwealth v. Paddy**, 800 A.2d 294, 316 (Pa. 2002)). "In reviewing a claim of improper prosecutorial comment, our standard of review is whether the trial court abused its discretion." **Commonwealth v. Noel**, 53 A.3d 848, 858 (Pa. Super. 2012). When considering such a contention, "our attention is focused on whether

- 15 -

the defendant was deprived of a fair trial, not a perfect one, because not every inappropriate remark by a prosecutor constitutes reversible error." *Id*. at 858 (citing **Commonwealth v. Lewis**, 39 A.3d 341, 352 (Pa. Super. 2012)). "A prosecutor's statements to a jury do not occur in a vacuum, and we must view them in context." **Noel**, 53 A.3d at 858.

Appellant's first claim of prosecutorial misconduct concerns the prosecutor's reference to the threat Appellant and his associates posed to the victim and his family. In particular, Appellant objected to the following statement in the prosecutor's closing: "The truth is going to get him [the victim] killed. It's going to get his family killed. . . . His wife, his children." N.T., 10/31/13, at 37; Appellant's Brief at 18.

Appellant's argument, in total, asserts as follows:

> While there was evidence in this case that Appellant's family tried to get the victim to retract his identification and repeatedly asserted to him that Appellant was innocent, there was no evidence that anybody ever threatened to physically harm or kill the victim, his wife or his children. To the contrary, his wife testified that Appellant's girlfriend was not at all aggressive when she came to their house. N.T. 10/30/13 at 69; RR 245a.

> The efforts by Appellant and his family to influence the victim's testimony was unquestionably wrong. It is a far cry, however, from trying to get the victim to retract his identification by telling him that Appellant was innocent and threatening to kill his wife and children. The prosecutor's statement was not a reasonable inference from the evidence at trial. Moreover, the implication that Appellant or his family had threatened to kill the victim, his wife and his children was highly prejudicial and could not have but made the jury hostile toward Appellant to the extent that they could not be fair.

Appellant's Brief at 19 (footnote omitted). Other than citing to our standard of review, Appellant fails to cite a single case in support of his claim of error.

At trial, the victim described the lengthy pressure, manipulation, and coercion he endured from Appellant's family. The victim described Appellant's relatives' appeals to his wife on Facebook that escalated to "popping up" at the victim's home. N.T., 10/29/13, at 114. Appellant's girlfriend and mother attempted to persuade the victim that Appellant had not been the shooter, by pressuring the victim and going to the victim's home. *Id*. at 122. The victim testified about his fear, stating:

> [W]hen [Appellant's family] left, I sure did always look out of my window. I sure did keep my door locked, to this day, and I haven't seen them in months, but to this day me and my wife still talk about it, still make sure our door is locked. . . . We still live with paranoia. . . . I know I was in danger.

*Id*. at 123–124). This menacing and continuing presence also was proven by evidence of prison telephone calls between Appellant and his family members. The fourth telephone call on September 13, 2011, referenced an earlier call that Sonny was "lookin for Andy," and included Appellant's entreaty to "stay on" the victim and his family. Prison Call Transcript, 9/13/11, at 1.[5] Appellant stated that he knew the victim identified Appellant as the man who shot him and instructed, "Get [the victim] to "clarify that

_____

[5] The transcripts of the prison telephone calls were played at trial for the jury and were submitted to this Court as a supplement to the certified record on February 27, 2015. N.T., 10/30/13, at 155–157.

- 17 -

shit." *Id*. at 2. The prison telephone calls revealed that the victim's house was being watched "to see like if the cops come in," by people who assured Appellant "it's gonna be handled." *Id*. at 4. As the trial court stated:

> Testimony at trial showed the Appellant's mother and girlfriend visited the [victim's] home multiple times prior to trial. N.T., 10/30/2013, at 68–71. This behavior was prompted by Appellant, who was heard on recorded phone calls from prison telling people to "stay on him." N.T., 10/31/2013, at 44. This evidence clearly established the Appellant's involvement in attempting to make the [victim] and others change their testimony. It is therefore reasonable to infer that [the victim and his wife] were fearful, since those close to the Appellant knew where they lived and had attempted to pressure them in the past. Under these circumstances, it is not prosecutorial misconduct for the prosecutor to cite to facts in evidence, and this claim should also fail.

Trial Court Opinion, 12/11/14, at 12–13.

The defense closing argument asserted that the Commonwealth witnesses, including the victim, presented "several days of lies." N.T., 10/31/13, at 25 30. The prosecutor's remark that the victim feared for his life and that of his family was proper rhetoric supported by the evidence and fairly responded to the defense assertion that the victim was a liar. *See Commonwealth v. Carson*, 913 A.2d 220, 236 (Pa. 2006) (stating a prosecutor is entitled to fairly respond to arguments made by defense counsel in closing argument); *Commonwealth v. Hogentogler*, 53 A.3d 866, 878 (Pa. Super. 2012) (stating, "In determining whether the prosecutor engaged in misconduct, we must keep in mind that comments made by a prosecutor must be examined within the context of defense counsel's

conduct. It is well settled that the prosecutor may fairly respond to points made in the defense closing."). We conclude that the prosecutor's comments were fair responses to defense allegations that the victim and other Commonwealth witnesses were liars, and they did not prejudice the jurors by forming a fixed bias and hostility toward Appellant. Thus, we reject this claim of error.

Appellant next alleges that the prosecutor erroneously asked the jurors to infer guilt based on the fact that Appellant did not "assert his innocence after he was arrested." Appellant's Brief at 20. Appellant objects to the following comment during closing argument:

> You know, I try to think about what I would do if I was accused of a crime I didn't commit. . . . My first phone call is going to be to my husband, and I am going to cry like a baby. I am going to tell him, "Baby, you're not going to believe this. I got arrested. Someone said I shot them. I can't believe this. I would never do something like that. I don't even have a gun. I don't know why they would say something like that."
>
> * * *
>
> That would be my first phone call. You know, I bet you something along those lines would be your first phone call, too, because that is what an innocent person says.

N.T., 10/31/13 at 45–46.

Appellant characterizes the above comment as a failure to deny guilt after arrest, and citing **Commonwealth v. Mitchell**, 839 A.2d 202, 212–214 (Pa. 2003), he asserts it was patently improper. Appellant maintains that a prompt cautionary instruction may have remedied the "innate

prejudice in such a comment," but no such instruction was given. Appellant's Brief at 20.

First, Appellant did not object to the above remark. N.T., 10/31/13, at 45, 46. Second, when he objected to a subsequent portion of the summation, he did not assert that remark or any other implicated an alleged failure to declare his innocence, nor did he request a cautionary instruction. *Id*. at 46. As no objection was posed, this issue was not preserved. *See* Pa.R.A.P. 302(a) (issues not raised in lower court are waived and cannot be raised for first time on appeal). Moreover, the failure to request a cautionary instruction constitutes a waiver of a claim of trial court error in failing to issue a cautionary instruction. *Commonwealth v. Wholaver*, 989 A.2d 883, 892 (Pa. 2010) (citing *Commonwealth v. Bryant*, 855 A.2d 726, 739 (Pa. 2004)). Thus, we conclude this claim is waived.

Appellant's fifth claim of error assails the weight of the evidence, an issue he preserved in his post-sentence motion. Appellant asserts that "this is the rare case where the verdict shocks the conscience." Appellant's Brief at 21. He maintains that the only evidence that Appellant was the assailant was the victim's testimony, which he characterizes as "highly unreliable." *Id*. The Commonwealth avers that this issue attacks the victim's credibility, and Appellant cannot meet the level that the verdict was "pure conjecture." Commonwealth Brief at 21 (citing *Commonwealth v. Gibbs*, 981 A.2d 274 (Pa. Super. 2007).

An allegation that the verdict is against the weight of the evidence is addressed to the discretion of the trial court. *Commonwealth v. Ramtahal*, 33 A.3d 602 (Pa. 2011). "An appellate court, therefore, reviews the exercise of discretion, not the underlying question whether the verdict is against the weight of the evidence." *Id*. at 609. "The trial court's denial of a motion for a new trial based on a weight of the evidence claim is the least assailable of its rulings." *Commonwealth v. Rivera*, 983 A.2d 1211, 1225 (Pa. 2009). "When the challenge to the weight of the evidence is predicated on the credibility of trial testimony, our review of the trial court's decision is extremely limited. Generally, unless the evidence is so unreliable and/or contradictory as to make any verdict based thereon pure conjecture, these types of claims are not cognizable on appellate review." *Commonwealth v. Rossetti*, 863 A.2d 1185, 1191 (Pa. Super. 2004) (quoting *Commonwealth v. Hunter*, 554 A.2d 550, 555 (Pa. Super. 1989)).

The trial court, in rejecting this claim, stated:

> In the instant case, there was eyewitness testimony from the [victim], identifying the Appellant as the individual who shot him. There was also testimony that other witnesses put Appellant at the scene on the night of the shooting, and testimony from Detective Casee in which Appellant identified himself on the phone and insisted the shooting "wasn't supposed to go down like that." N.T., 10/30/2013, at 145.

> * * *

> Here, the jury chose to credit the testimony of the complainant, his family members, and the detectives investigating the case. The fact that the jury believed the testimony of [the victim] and Detective Casee does not shock one's sense of justice.

- 21 -

Trial Court Opinion, 12/11/14, at 15.

Appellant essentially asks this Court to reassess the credibility of the witnesses. It is well settled that we cannot substitute our judgment for that of the trier of fact. *Commonwealth v. Gibbs*, 981 A.2d 274, 282 (Pa. Super. 2009); *Commonwealth v. Holley*, 945 A.2d 241, 246 (Pa. Super. 2008). The fact-finder was free to believe the testimony of any, all, or none of the witnesses. *See Commonwealth v. Lee*, 956 A.2d 1024, 1029 (Pa. Super. 2008) ("[I]t is for the fact-finder to make credibility determinations, and the finder of fact may believe all, part, or none of a witness's testimony."). Here, the trial court considered Appellant's claims and determined that they did not compel the conclusion that the verdicts were so contrary to the evidence as to shock one's sense of justice. Trial Court Opinion, 12/11/14, at 15. Upon review, we discern no abuse of discretion in the trial court's determination. *Commonwealth v. Ferguson*, 107 A.3d 206, 213 (Pa. Super. 2015).

Appellant's final issue relates to the discretionary aspects of his sentence. An appellant seeking discretionary review of his sentence has no absolute right to do so but rather, must petition this Court for permission. *Commonwealth v. Buterbaugh*, 91 A.3d 1247, 1265 (Pa. Super. 2014), *appeal denied*, 104 A.3d 1 (Pa. 2014); 42 Pa.C.S. § 9781(b). Before we may review the merits of a challenge to the discretionary aspects of a sentence, we must engage in a four-pronged analysis to determine:

(1) whether appellant has filed a timely notice of appeal, *see* Pa.R.A.P. 902 and 903; (2) whether the issue was properly preserved at sentencing or in a motion to reconsider and modify sentence, *see* Pa.R.Crim.P. [708]; (3) whether appellant's brief has a fatal defect, Pa.R.A.P. 2119(f); and (4) whether there is a substantial question that the sentence appealed from is not appropriate under the Sentencing Code, 42 Pa.C.S.A. § 9781(b).

***Commonwealth v. Levy***, 83 A.3d 457, 467 (Pa. Super. 2013) (quoting

***Commonwealth v. Moury***, 992 A.2d 162, 170 (Pa. Super. 2010)).

Herein, because Appellant has filed a timely appeal, preserved the issue in a post-sentence motion, and included a statement pursuant to Pa.R.A.P. 2119(f) in his brief, he has complied with the first three requirements of the four-prong test. Therefore, we next determine whether Appellant raises a substantial question requiring us to review the discretionary aspects of the sentence imposed by the trial court.

In his Pa.R.A.P. 2119(f) statement, Appellant contends his sentences for robbery and the firearms violation were at the upper end of the aggravated range of the Sentencing Guidelines and were an abuse of discretion because 1) the trial court failed to put its reasons on the record for sentencing in the aggravated range, and 2) the trial court relied on an improper sentencing factor. These claims present substantial questions. ***Commonwealth v. Antidormi***, 84 A.3d 736, 759 (Pa. Super. 2014) (allegation that the sentencing court imposed a sentence outside the standard guidelines without providing adequate reasons on the record presents a substantial question); ***Commonwealth v. Booze***, 953 A.2d

1263, 1278 (Pa. Super. 2008) (allegation that trial court failed to state adequate reasons on the record for imposing an aggravated-range sentence raises a substantial question).

The trial court stated that there is nothing in the record to support the conclusion that it based the sentence on Appellant's family members **in the courtroom**. Rather, the trial court noted that it considered the family members' behavior **before** sentencing. The court also stated the sentencing transcript "reveals an in-depth discussion of the factors weighed by this court at sentencing." Trial Court Opinion, 12/11/14, at 18.

It is well settled that

> [s]entencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion. In this context, an abuse of discretion is not shown merely by an error in judgment. Rather, the appellant must establish, by reference to the record, that the sentencing court ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias or ill will, or arrived at a manifestly unreasonable decision.

***Commonwealth v. Caldwell***, ____ A.3d ____, ____, 2015 PA Super 128, *4 (Pa. Super., filed May 29, 2015).

The trial court indicated that it was aware of the guideline ranges for Appellant's convicted offenses. N.T., 4/28/14, at 4–6. In addition, the trial court stated that it read and considered the presentence report. ***Id***. at 3. Regarding the guideline ranges, our Supreme Court reiterated that "the guidelines have no binding effect, create no presumption in sentencing, and do not predominate over other sentencing factors—they are advisory

- 24 -

guideposts that are valuable, may provide an essential starting point, and that must be respected and considered; they **recommend**, however, rather than require a particular sentence." *Commonwealth v. Perry*, 32 A.3d 232, 240 (Pa. 2011) (emphasis added) (citing *Commonwealth v. Walls*, 926 A.2d 957, 964–965 (Pa. 2007). Moreover, when the record demonstrates that the sentencing court was aware of the guideline ranges, as here, *see* N.T., 4/28/14, at 5, we will not reverse merely because the specific ranges were not recited at the sentencing hearing. *Commonwealth v. Griffin*, 804 A.2d 1, 7-8 (Pa. Super. 2002). Our review of the record compels the conclusion that the court stated adequate reasons for imposing an aggravated-range sentence. *Booze*, 953 A.2d at 1280.

Regarding his claim related to his family members, Appellant underscores the following comments by the trial court at sentencing:

> You chose, and this is really what bothers me about this case and what really goes on too often in this city, is that instead of these cases being decided in the courtroom and you yourself, Mr. Lewis, said this and thanked me for being fair. I just followed the rules and allowed witnesses to testify and appropriate evidence to come in and your attorney could fully represent you. But you didn't want that. Your family didn't want that. They didn't want the twelve to decide. They wanted it decided on the street so the case would go away and [Appellant] couldn't be found and we would never have a trial . . . .
>
> * * *
>
> I see your family leaving because they don't want to listen to this part for whatever reason.

N.T., 4/28/14, at 35–36.[6]  Appellant's entire argument relating to the above comments are that they are indicative that the court "consider[ed] the motivations or independent actions" of persons other than Appellant in imposing Appellant's sentence.  Appellant's Brief at 25.  This claim is specious.

We find nothing improper regarding the trial court's comments made as Appellant's family members filed out of the courtroom when the trial court explained its sentence.  Rather than an indication that it relied upon an impermissible factor, the comments were merely observations of conduct occurring in the courtroom.  Further, as noted by the Commonwealth, Appellant's family had displayed intimidating, aggressive tactics in its endeavor to persuade the victim to retract his identification of Appellant as his shooter.  Appellant goes to great lengths to dissuade us that he is not challenging consideration of that behavior.  *See* Appellant's Brief at 24.  In light of that egregious behavior, we do not find the trial court's observation of Appellant's family members' flight from the courtroom at the moment the trial court commented on that behavior to be equated with reliance on an impermissible sentencing factor.

_____

[6]  The trial court did not respond to this particular quotation because Appellant's statement of the claim in both his post-sentence motion and Pa.R.A.P. 1925(b) statement was vaguely worded and failed to underscore these comments.  Post-Sentence Motion, 5/1/14, at unnumbered 2–3; Pa.R.A.P. 1925 (b) Statement, 10/1/14, at ¶ 7.

Moreover, defense counsel had purposely pointed out the great number of Appellant's family members present in the courtroom by asking them to stand up. N.T., 4/28/14, at 9. Both of Appellant's grandmother's spoke on Appellant's behalf. *Id*. at 11–16. The trial court did not limit Appellant's presentation of witnesses, and in handing down its sentence, the trial court specifically acknowledged that it considered the comments of Appellant's family, noting, "I've considered the presentence, the mental health, the memorandum submitted by the Commonwealth, **the testimony at today's hearing from [Appellant's] family**, of course the trial testimony and what [Appellant] had to say. . . ." *Id*. at 31 (emphasis added). In addition, the trial court considered the nature and circumstances of the offense, including the gravity of the offense and the impact on the life of the victim. *Id*. at 34. We conclude that the record does not support the trial court's consideration of an improper factor at sentencing.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 9/14/2015

- 27 -